AKZONA, INC. v. SOUTHERN RAILWAY COMPANY

No. 628PA83

(Filed 1 October 1985)

1. **Eminent Domain § 2.6— flooding of property—not inverse condemnation**

The flooding of plaintiff's downstream property caused by the erosion of an embankment, lawfully and purposely constructed by defendant railway across a stream, does not constitute a taking of plaintiff's downstream property where the embankment was not replaced and thus could not cause recurrent flooding of plaintiff's property. Therefore, the trial court erred in instructing the jury on inverse condemnation.

2. **Rules of Civil Procedure § 50— failure to charge—implied directed verdicts**

Where the trial court did not instruct the jury with respect to negligence, trespass, and strict liability, the charge amounted to an implied directed verdict on those issues.

3. **Appeal and Error § 47— remand for new trial—failure to direct verdict on issue as harmless error**

The appellate court's decision to remand this case for a new trial renders harmless any error by the trial court in failing to direct a verdict for defendant on the issue of interference with plaintiff's riparian rights since, on remand, plaintiff is not bound by the evidence presented at the former trial.

4. **Negligence § 7— inadequate culverts—willful and wanton negligence—sufficiency of evidence**

Plaintiff's evidence was sufficient for the jury on the issue of willful and wanton negligence by defendant railway in the flooding of plaintiff's downstream property when an embankment constructed by defendant across a creek burst after causing water to back up during heavy rain where the jury could find from the evidence that defendant was aware that its culverts through the embankment were inadequate to accommodate the flow of water

in the creek during peak periods, that defendant's management adopted a recommendation that the culverts be removed and replaced with a bridge, but that defendant terminated the plan to remove the embankment and replace it with a bridge after it was sued by upstream landowners for damage done in a prior flood.

Justices MARTIN and BILLINGS did not participate in the consideration or decision of this case.

ON defendant's petition for discretionary review prior to determination by the North Carolina Court of Appeals of a judgment entered by *Judge C. Walter Allen* in the BUNCOMBE County Superior Court.

*Van Winkle, Buck, Wall, Starnes & Davis, P.A., by Albert L. Sneed, Jr.; Roberts, Cogburn, McClure and Williams by Landon Roberts; J. Frank Huskins for plaintiff appellee.*

*Bennett, Kelly & Cagle, P.A., by Harold K. Bennett; Brooks, Pierce, McLendon, Humphrey & Leonard by L. P. McLendon, Jr., for defendant appellant.*

EXUM, Justice.

This case presents the issue of whether the flooding of downstream property caused by the erosion of an embankment, lawfully and purposely constructed across a stream, constitutes a taking as the trial court instructed the jury. We hold that this situation does not constitute a taking and the trial court erred in its instructions. Accordingly, we vacate the trial court's judgment and remand the case for a new trial.

I.

Defendant, Southern Railway Company (Railroad), owns, maintains, and operates a railroad line which runs from Asheville to Murphy in North Carolina. This railroad track crosses over Pole Creek at a point just west of Asheville. At that junction the railroad track lies generally in an east-west direction, while Pole Creek flows generally north-south. Pole Creek does not approach its intersection with the railroad track in a perpendicular fashion, but rather approaches it at an acute angle.

Approximately 1,000 feet south of this intersection, Pole Creek empties into Hominy Creek, which flows generally west-

east. Approximately one and one-half miles downstream, Hominy Creek passes by the American Enka Plant and runs through lands owned by plaintiff, Akzona, Inc. Akzona owns and operates the Enka Plant.

In times of heavy rainfall, this basin is susceptible to flooding. In the 1940's Akzona constructed a 12- to 15-foot dike between its plant and Hominy Creek. The dike, designed to provide some measure of protection to the Enka Plant from flooding, had four openings or passageways, each designed to permit access to the Enka Plant. Gate A allowed State Road 112 to pass through the dike; Gate B was located at the filter plant; Gates C and D permitted the railroad spurs into the plant. These gates could be closed to protect the plant by forming a solid wall between it and Hominy Creek but permission was required from the State Highway Department before Gate A could be closed.

Prior to 1956 Railroad passed its track across Pole Creek across an open trestle. This structure provided a large area through which the water in Pole Creek might pass. It also accommodated the natural creek bed intersecting the path of the railroad at an acute angle.

Railroad altered the Pole Creek crossing in 1956 by placing under the trestle three culvert pipes, each seven feet in diameter. These pipes, placed side-by-side at the extreme eastern end of the trestle, were perpendicular to the railroad tracks. In order for these culverts to accommodate the flow of Pole Creek, the natural flow and direction of the creek had to be altered. Railroad left the trestle supports in place and filled in the area beneath the trestle with gravel and dirt. When the trestle was filled to the level of the rails, some twenty feet above the creek bed, it formed a solid earthen wall across Pole Creek except for the three seven-foot culverts. The embankment, made of gravel and fill, had no shielding or spilling-type covering to prevent erosion should water overtop it. The embankment was covered with grass and vegetation.

After the embankment was created in 1956, water occasionally backed up behind it to form a pond. Some flooding occurred upstream. Blanche Young, a local resident and an upstream landowner, complained to Railroad about the flooding.

After a heavy rainfall in April 1977, Pole Creek began to rise. Water backed up behind the embankment and Pole Creek came out of its banks. Water rose to a level five feet above the top of the culverts. Considerable flooding resulted to upstream property.

After the flooding, Henry VeHaun, coordinator of the Buncombe County Civil Preparedness Agency, corresponded with J. W. DeValle, Railroad's Chief Engineer for Bridges, concerning the flooding at the Pole Creek crossing. Railroad sent John Maclin, a graduate engineer, to investigate the waterway at Pole Creek. Using customary engineering standards, Maclin calculated the size of the waterway area needed to carry off water at the embankment. In his report Maclin noted: (1) he was informed that high water had occurred at this location three or four times within the last two years; (2) the culverts do not have the capacity to carry the rainfall run-off from a storm the size of the 4 April 1977 storm; (3) an examination of the vegetation indicated that the water crested during that storm at approximately five feet above the top of the culverts; (4) significant sources of debris existed upstream which might be carried by floodwaters and block the culverts; and (5) United States Highway 19-23, which crosses Pole Creek about 500 feet upstream of the embankment, uses a highway bridge with a larger waterway that was still inadequate to carry off peak flows of Pole Creek, even though this bridge was above the sources of debris.

In accordance with Railroad's standard procedure, a report of the study was sent to DeValle. Based upon this report, DeValle reported in writing to his superiors that the culverts were inadequate to carry peak flows of the creek and recommended that the culverts be removed and the embankment replaced with a bridge. Railroad began plans to construct a bridge across Pole Creek. On 3 June 1977 several upstream landowners sued Railroad in a single action unrelated to the present case. They alleged that because of the inadequacy of the culverts and the diverting of the natural flow of Pole Creek, their property had been damaged. These plaintiffs alleged damages resulting from three different floods which occurred on 23 September 1975, 22 May 1976, and 5 April 1977. After these actions were initiated, Railroad discon-

tinued its plans to remove the embankment and replace it with a bridge.[1]

In late October and early November 1977, periodic rainfall fell in western North Carolina. On 5 November 1977 heavy rains began to fall in the Hominy Creek basin. The water in Pole Creek backed up behind the embankment. By 12:10 a.m. on 6 November 1977, the water had already come out of Pole Creek's banks; it overflowed the State Road upstream of the embankment.

At 12:20 a.m. that same day, Enka's flood crews were called to the plant to initiate a flood control procedure. They began the procedure for closing the various gates, which included digging out asphalt plugs in the holes which had been drilled into the highway.[2] The crews cleared only a small number of the holes before Hominy Creek came out of its banks and reached waist level at approximately 1:30 a.m. The crew was forced to evacuate the area near Gate A without having closed the gate. Enka was in full operation when the waters poured through Gate A. Enka was flooded to a depth of fifty-nine and one-half inches.

Akzona initiated this action alleging an unreasonable interference with surface waters, negligent design and modification of the embankment, inverse condemnation through the design of the embankment, trespass, and the creation of a dangerous instrumentality. At the beginning of the trial, Judge Allen allowed Akzona's motion to amend its complaint to allege a sixth count, i.e., willful and wanton conduct by Railroad. After a three-week trial, Judge Allen directed a verdict against Akzona on the issue of willful and wanton conduct. He denied Railroad's motion for a directed verdict on the other five counts. He submitted the following issue to the jury: "Did the defendant Southern Railway Company obstruct, divert, or otherwise interfere with the natural flow of surface water proximately causing damage to the proper-

1. Railroad has since reversed this decision. It removed the embankment and its track now crosses Pole Creek via a bridge.

2. These holes formed a part of the gates which, when erected, would close the four gaps in the dike. Ten or more of these holes had been drilled into the pavement to accommodate metal stanchions. After the stanchions were in place, they would be braced with steel and would hold two rows of approximately fifty timbers, with the rows separated by a small space. This space would be filled with clay to form a solid wall.

ty of the plaintiff, Akzona, Inc.?" He also instructed the jury on inverse condemnation. The jury answered this issue affirmatively and awarded Akzona $2,317,700 in damages. The trial court added prejudgment interest of $866,375.03. Railroad gave notice of appeal to the North Carolina Court of Appeals. On 20 December 1983 Railroad petitioned this Court for discretionary review prior to determination, N.C. Gen. Stat. § 7A-31(b). We allowed this petition on 2 February 1984.

II.

[1] Railroad contends the trial court erred in giving instructions to the jury relating to inverse condemnation. Judge Allen charged the jury, in pertinent part:

> Now, members of the jury, Southern Railway had the right and authority to appropriate and make use of the property on which the railway was placed for railway purposes, with or without the consent of Akzona or the owners of property on which the railway was located. We justify this right on the grounds that the rights of the individual must yield to the consideration of the public good and common welfare, which is recognized by the construction of railway systems throughout the country. However, when an entity, such as the Southern Railway, takes or appropriates private property for public use, fair play and the Constitution and laws of this State impose upon Southern Railway, and other entities in the same light, a correlated duty to make just compensation to the owner for the property appropriated. Where by compulsory process and for the public good, Southern Railway or any other entity clothed with the authority of eminent domain, appropriates property of its citizens in the exercise of its right to eminent domain it must pay just compensation, and compensation must be full and complete and include everything which affects the value of the property taken in relation to the property affected.

Railroad argues a single, nonrecurrent instance of flooding cannot constitute a taking of plaintiff's property under either the federal or state constitutions.

In *Lea Co. v. N.C. Board of Transportation*, 308 N.C. 603, 611, 304 S.E. 2d 164, 171 (1983) (quoting *Midgett v. North Carolina*

*State Highway Commission*, 260 N.C. 241, 248, 132 S.E. 2d 599, 606 (1963) ) (citations and emphasis in original omitted), we reviewed the elements of an inverse condemnation action:

'In order to create an enforceable liability against the government it is, at least, necessary [1] that the overflow of water be such as was reasonably to have been anticipated by the government, to be the direct result of the structure established and maintained by the government, and [2] constitute an actual permanent invasion of the land or a right appurtenant thereto, amounting to an appropriation of and not merely an injury to the property.'

We need not address the first element of the *Lea* standard in this case because the evidence does not show that "the defendant's structures caused an actual, permanent invasion of the plaintiff's land . . . ." *Id.* at 618, 304 S.E. 2d at 175. Railroad constructed an embankment of earth and gravel across Pole Creek. The embankment acted as a dam when a large volume of water backed up behind it. Under pressure caused by relentless rainfall and the inability of a saturated ground to absorb moisture, the dam burst. It was not replaced after it burst. Railroad's embankment, therefore, cannot subject plaintiff's property to "[p]ermanent liability to intermittent, but inevitably recurring, overflows . . . ." *Id.* at 618, 304 S.E. 2d at 175. A single instance of flooding with no possibility of recurrence, even if the direct result of Railroad's structure, is not a taking of Akzona's property. Because the trial court should not have instructed the jury on inverse condemnation, this case must be remanded for a new trial.

### III.

In addition to inverse condemnation, plaintiff's complaint alleged interference with riparian rights, negligence, willful and wanton conduct, trespass and strict liability. At the close of all the evidence, defendant moved for a directed verdict on each of plaintiff's allegations. The trial court directed a verdict on the issue of willful and wanton conduct but otherwise denied defendant's motion. Railroad assigns error to the trial court's denial of its motion and plaintiff cross-appeals from the granting of a directed verdict on the issue of willful and wanton conduct.[3]

---

3. Railroad moves to dismiss Akzona's cross-appeal because Akzona failed in its brief to make "reference to the exceptions pertinent to each question and . . . to

[2, 3] Although the trial court denied Railroad's motion for a directed verdict, it charged the jury on only one issue other than inverse condemnation, i.e., interference with Akzona's riparian rights. Because the trial court did not instruct the jury with respect to negligence, trespass and strict liability, its jury charge amounted to an implied directed verdict on those issues. We express no opinion on the correctness of this determination. It suffices to say that any error by the trial court in failing to direct a verdict with respect to these issues as to Railroad was harmless. Our decision to remand this case for a new trial also renders harmless any error by the trial court in failing to direct a verdict for interference with Akzona's riparian rights. On remand, Akzona is not bound by the evidence presented at the former trial. Whether its evidence at the new trial will support submission of the case on any or all of these theories cannot now be decided.

[4] On plaintiff's cross-appeal, we find error in the trial court's order directing a verdict on its claim that Railroad acted willfully and wantonly. We discussed willful and wanton negligence in *Foster v. Hyman*, 197 N.C. 189, 148 S.E. 36 (1929):

> An act is done wilfully when it is done purposely and deliberately in violation of law, or when it is done knowingly and of set purpose, or when the mere will has free play, without yielding to reason. 'The true conceptions of wilful negligence involves a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract, or which is imposed on the person by operation of law.'

> An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.

identify those exceptions by their numbers and by the pages of the printed record on appeal at which they appear" in violation of App. R. 28(b)(5). Akzona's brief on its cross-appeal does refer to the assignment of error which in turn refers to the exception and page number in the record on which the argument is based. Although Akzona has not strictly complied with App. R. 28(b)(5), inasmuch as only one exception is involved and was properly preserved in the record and referred to in the assignment of error, we decline to apply the extreme sanction of dismissing the cross-appeal. We elect, instead, to deny Railroad's motion and to consider the merits of the cross-appeal.

*Id.* at 191, 148 S.E. at 37-38 (citations omitted). While "[o]rdinary negligence has as its basis that a person charged with negligent conduct should have known the probable consequences of his act," we have said "[w]anton and willful negligence rests on the assumption that he knew the probable consequences, but was recklessly, wantonly or intentionally indifferent to the results." *Wagoner v. North Carolina Railroad*, 238 N.C. 162, 168, 77 S.E. 2d 701, 706 (1953).

Plaintiff produced evidence in this case that Railroad's engineering department conducted an investigation of the embankment in Pole Creek after the April 1977 flood. Mr. J. W. De-Valle, Chief Engineer of Bridges for Southern Railway filed a report which concluded:

> We have reviewed the drainage area tributary to our culverts, and find that, from the Enka topography map the total drainage area is approximately 5,900 acres. Based on the stream flow calculations, a waterway area of 484 square feet is theoretically required. As pointed out earlier the highway bridge which carries U.S. 19 and 23 across Pole Creek just upstream from our culverts has only 277 square feet. Our three culverts which are located downstream from the highway bridge have only 114 square feet.

> It seems apparent that the culverts which were installed in 1956 at this location are inadequate to carry peak flows of the creek. It also seems obvious that the highway bridge immediately upstream is inadequate to carry peak flows of the stream. It further seems obvious that the local poor housekeeping, resulting in drift and debris clogging this stream upstream from our culverts, and the constriction of the stream immediately downstream from our culverts are all contributing factors.

> Considering all factors, including the possibility of litigation arising out of our culverts which are inadequate in size, we believe that our drainage structure at this location needs revision. There is no apparent way to straighten out Pole Creek in its devious approach to the upstream side of our culverts, for to do so would cause it to be diverted through adjacent property. There is no way also to move the location of the creek through the downstream area, because of its de-

velopment by the sawmill interests. The most obvious solu-
tion would be to remove the culverts and to install a bridge
without intermediate supports, which would cause no inter-
ference with the flow of the creek.

. . . .

. . . [W]e are obviously at least a contributory factor to the
flooding, . . . .

It is my suggestion that Mr. Morgret tell local affected
interests that our culverts have been in place since 1956, that
we have photographs of the stream restrictions which indi-
cate that their ability to transport the flood waters was
seriously diminished, but that Southern's Engineering De-
partment is making plans to provide additional waterway
opening at this location, in order to minimize future possibili-
ty of drift clogging the stream opening under our track.

The Bridge Department observed "[m]aintaining the existing
culvert will make the Railroad liable for flood damage claims
estimated to average at least $10,000.00 per year" and recom-
mended the culverts be removed and replaced with a bridge.
These recommendations were adopted by Railroad's management.
After Railroad was sued by upstream landowners for damage
done in the April 1977 flood, Railroad terminated its plans to
remove the embankment and replace it with a bridge.

We think a jury could find from the evidence stated above
that Railroad was aware that its culverts were inadequate to ac-
commodate the flow of water through Pole Creek. We think a
jury could find further that Railroad, while conscious of the conse-
quences of its failure to act, "purposely and deliberately"
neglected to renovate its crossing at Pole Creek or at least acted
with "reckless indifference to the rights" of the flood basin land-
owners. The trial judge, therefore, erred in directing a verdict in
defendant's favor on the issue of willful and wanton negligence.

IV.

Both Railroad in its appeal and Akzona in its cross-appeal
assign error in the admission and exclusion of various items of
evidence. Since we are remanding the case for a new trial, we
decline to consider these assignments. Some of this evidence,

whether admitted or excluded at the previous trial, may not be offered at retrial. Our trial judges are eminently capable of ruling on evidentiary issues. We feel it is proper to defer these matters to the trial judge who presides over the continuation of this case.

In addition, a new evidence code became effective in North Carolina on 1 July 1984. It is likely that these rules will have an impact on the law of evidence in this state. *See* Crumpler & Widenhouse, "An Analysis of the New North Carolina Evidence Code: Opportunity for Reform," 20 Wake Forest L. Rev. 1 (1984) (analyzing several changes made by the new rules). These new rules will govern the evidentiary questions which arise at retrial, and the trial court deserves an opportunity to rule on such questions under these rules in the first instance. Accordingly, we express no opinion on these issues.

## V.

We conclude that the trial court erred in charging the jury on the theory of a taking of Akzona's property. This instruction constitutes reversible error. We also conclude that the trial court erred in granting Railroad's motion for a directed verdict on the issue of willful and wanton conduct. Accordingly, we vacate the judgment of the trial court and remand this case to the Buncombe County Superior Court for a

New trial.

Justices MARTIN and BILLINGS did not participate in the consideration or decision of this case.