DELBERT JOSEPH MUSE, JR., Administrator of the Estate of DELBERT JOSEPH
MUSE, III, and JANE K. MUSE, Plaintiffs v. CHARTER HOSPITAL OF WINSTON-
SALEM, INC. and CHARTER MEDICAL CORPORATION, Defendants

No. 9318SC265

(Filed 3 January 1995)

1. **Corporations § 5 (NCI4th)— instrumentality theory—separate issues against two entities—submission error**

    The result of finding a corporation to be a mere instrumentality of another is that the two are treated as one for purposes of assessing liability for the alleged wrong and are jointly and severally liable; therefore, submitting separate issues of punitive damages as to defendant Charter Hospital of Winston-Salem and as to defendant Charter Medical Corporation, whose liability was based on the instrumentality theory, was error.

    **Am Jur 2d, Corporations §§ 43 et seq.**

    **Liability of corporation for torts of subsidiary. 7 ALR3d 1343.**

2. **Hospitals and Medical Facilities or Institutions § 64 (NCI4th)— duty of hospital not to institute policy interfering with medical judgment of doctor**

    Pursuant to the reasonable person standard, defendant Charter Hospital had a duty not to institute a policy or practice which required that patients be discharged when their insurance expired and which interfered with the medical judgment of deceased's treating physician.

    **Am Jur 2d, Hospitals and Asylums §§ 14 et seq.**

3. **Hospitals and Medical Facilities or Institutions § 64 (NCI4th)— discharge of patient when insurance ran out— hospital's practice interfering with doctor's exercise of medical judgment—sufficiency of evidence**

    In an action to recover for the wrongful death of plaintiff's intestate who was discharged from defendant hospital allegedly because his insurance ran out and not because his progress warranted it, evidence was sufficient to support the jury's finding that defendant hospital had a practice which interfered with the ability of the doctor to exercise his medical judgment and that defend-

ant acted knowingly and of set purpose and with reckless indifference to the rights of others.

**Am Jur 2d, Hospitals and Asylums §§ 14 et seq.**

4. **Hospitals and Medical Facilities or Institutions § 64 (NCI4th)— suicidal patient discharged by hospital—negligence of parents and treating physician—no insulating negligence**

The evidence was insufficient to support defendants' contention that the superseding negligence of plaintiff parents and their son's treating physician insulated the negligence of defendant hospital as a matter of law where it tended to show that the hospital had a policy of requiring the discharge of patients when their insurance expired; this policy interfered with the physician's medical judgment regarding the patient's discharge; and any negligence of the physician in discharging the patient and in not warning his parents, or of the parents in not properly supervising their son after discharge, did not turn aside the natural sequence of events set in motion by the hospital's misconduct.

**Am Jur 2d, Hospitals and Asylums §§ 14 et seq.**

5. **Hospitals and Medical Facilities or Institutions § 64 (NCI4th)— suicidal patient—negligence by psychiatric hospital—suicide not superseding cause of death**

Where a psychiatric hospital has assumed the care of a suicidal patient, and as a result of its negligence, the patient commits suicide, the hospital cannot claim that the suicide was a superseding cause, insulating the hospital from liability.

**Am Jur 2d, Hospitals and Asylums §§ 14 et seq.**

**Liability of hospital, other than mental institution, for suicide of patient. 60 ALR3d 880.**

6. **Damages § 178 (NCI4th)— punitive damage award—court's post-judgment analysis**

Defendants could not complain that the trial court must articulate a detailed post-judgment analysis of a jury's award of punitive damages and that failure to do so violates due process, since the court did give a detailed and thoughtful analysis regarding the propriety of the verdict.

**Am Jur 2d, Damages §§ 1032 et seq.**

**7. Damages § 178 (NCI4th)— punitive damages six times compensatory damages—award not constitutionally unacceptable**

There is no bright line between what is constitutionally acceptable and what is constitutionally unacceptable with regard to punitive damages; in this wrongful death action where defendant's willful and wanton conduct resulted in decedent's suicide, the award of punitive damages, which was six times the amount of the compensatory damages, was not unconstitutional.

**Am Jur 2d, Damages §§ 1032 et seq.**

**Excessiveness or adequacy of punitive damages awarded in personal injury or death cases. 12 ALR5th 195.**

**8. Damages § 127 (NCI4th)— punitive damages—due process requirements**

There was no merit to defendant's contention that due process required that punitive damages be based on conduct which was intentional or willful, that the burden of proof should be higher than a preponderance of the evidence, and that evidence of a defendant's net worth be excluded or allowed only after the determination has been made by a jury that punitive damages should be awarded.

**Am Jur 2d, Damages §§ 762 et seq.**

**9. Trial § 555 (NCI4th)— alleged juror misconduct—new trial denied—no error**

The trial court did not err in denying defendants' motion for a new trial based on juror misconduct where the juror allegedly failed to disclose information during voir dire, but the court found that all of the pertinent information was available to defendants in time for them to have the juror excused peremptorily or for cause.

**Am Jur 2d, New Trial §§ 159 et seq.**

Judge ORR dissenting.

Appeal by defendants from judgment entered 9 January 1992 and order filed 11 June 1992 by Judge Thomas W. Ross in Guilford County Superior Court. Heard in the Court of Appeals 6 January 1994.

## MUSE v. CHARTER HOSPITAL OF WINSTON-SALEM

[117 N.C. App. 468 (1995)]

*Berry & Byrd, by Wade E. Byrd, for plaintiffs-appellees.*

*Smith Helms Mulliss & Moore, by Bynum M. Hunter and Alan W. Duncan; and Law Office of James R. Hubbard, by James R. Hubbard, for defendants-appellants.*

*Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, P.A., by Adam Stein; and Elizabeth F. Kuniholm for North Carolina Academy of Trial Lawyers, amicus curiae.*

*Poyner & Spruill, by John R. Jolly, Jr., Samuel O. Southern, Robert O. Crawford, III, and Benjamin P. Dean, for North Carolina Association of Defense Attorneys, amicus curiae.*

*Weissburg and Aronson, Inc., by Mark E. Reagan; and Clark C. Havighurst for Federation of American Health Systems, amicus curiae.*

LEWIS, Judge.

This appeal arises from a judgment in favor of plaintiffs in an action for the wrongful death of Delbert Joseph Muse, III (hereinafter "Joe"). Joe was the son of Delbert Joseph Muse, Jr. (hereinafter "Mr. Muse") and Jane K. Muse (hereinafter "Mrs. Muse"), plaintiffs. The jury found that defendant Charter Hospital of Winston-Salem, Inc. (hereinafter "Charter Hospital" or "the hospital") was negligent in that, *inter alia*, it had a policy or practice which required physicians to discharge patients when their insurance expired and that this policy interfered with the exercise of the medical judgment of Joe's treating physician, Dr. L. Jarrett Barnhill, Jr. The jury awarded plaintiffs compensatory damages of approximately $1,000,000. The jury found that Mr. and Mrs. Muse were contributorily negligent, but that Charter Hospital's conduct was willful or wanton, and awarded punitive damages of $2,000,000 against Charter Hospital. Further, the jury found that Charter Hospital was an instrumentality of defendant Charter Medical Corporation (hereinafter "Charter Medical") and awarded punitive damages of $4,000,000 against Charter Medical.

The facts on which this case arose may be summarized as follows. On 12 June 1986, Joe, who was sixteen years old at the time, was admitted to Charter Hospital for treatment related to his depression and suicidal thoughts. Joe's treatment team consisted of Dr. Barnhill, as treating physician, Fernando Garzon, as nursing therapist, and Betsey Willard, as social worker. During his hospitalization, Joe experienced auditory hallucinations, suicidal and homicidal

thoughts, and major depression. Joe's insurance coverage was set to expire on 12 July 1986. As that date neared, Dr. Barnhill decided that a blood test was needed to determine the proper dosage of a drug he was administering to Joe. The blood test was scheduled for 13 July, the day after Joe's insurance was to expire. Dr. Barnhill requested that the hospital administrator allow Joe to stay at Charter Hospital two more days, until 14 July, with Mr. and Mrs. Muse signing a promissory note to pay for the two extra days. The test results did not come back from the lab until 15 July. Nevertheless, Joe was discharged on 14 July and was referred by Dr. Barnhill to the Guilford County Area Mental Health, Mental Retardation and Substance Abuse Authority (hereinafter "Mental Health Authority") for outpatient treatment. Plaintiffs' evidence tended to show that Joe's condition upon discharge was worse than when he entered the hospital. Defendants' evidence, however, tended to show that while his prognosis remained guarded, Joe's condition at discharge was improved. Upon his discharge, Joe went on a one-week family vacation. On 22 July he began outpatient treatment at the Mental Health Authority, where he was seen by Dr. David Slonaker, a clinical psychologist. Two days later, Joe again met with Dr. Slonaker. Joe failed to show up at his 30 July appointment, and the next day he took a fatal overdose of Desipramine, one of his prescribed drugs.

On appeal, defendants present numerous assignments of error. We find merit in one of defendants' arguments.

## I.

[1] Defendants contend that the separate awards of punitive damages against Charter Hospital and Charter Medical were improper. Charter Medical's liability was based solely on the jury's finding that Charter Hospital was an instrumentality of Charter Medical. The trial court submitted to the jury two separate issues:

9) What amount of punitive damages, if any, does the jury, in its discretion, award against the Defendant, Charter Hospital of Winston-Salem, Inc., to the Plaintiff, Administrator?

10) What amount of punitive damages, if any, does the jury, in its discretion, award against the Defendant, Charter Medical Corporation, to the Plaintiff, Administrator?

The court instructed the jury that it could award punitive damages "against the defendant Charter Hospital of Winston-Salem in Issue 9 and/or against the defendant Charter Medical Corporation in Issue

10." We believe that the jury instructions and the issues submitted were error.

The instrumentality theory, upon which Charter Medical's liability was based, holds: " 'A corporation which exercises actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts of the corporation thus controlled. In such instances, the separate identities of parent and subsidiary . . . may be disregarded.' " *B-W Acceptance Corp. v. Spencer*, 268 N.C. 1, 8, 149 S.E.2d 570, 575 (1966) (quoting 19 Am. Jur. 2d *Corporations* § 717). That is, the parent and the subsidiary are treated as "one and the same person." *Henderson v. Security Mort. & Fin. Co.*, 273 N.C. 253, 260, 160 S.E.2d 39, 44 (1968). Our research has disclosed no case in which more than one sum has been awarded against two defendants under the instrumentality theory. *Cf. Postell v. B & D Constr. Co.*, 105 N.C. App. 1, 411 S.E.2d 413 (holding that the controlling individual was jointly and severally liable with the controlled corporation), *disc. review denied*, 331 N.C. 286, 417 S.E.2d 253 (1992). We conclude that the result of finding a corporation to be a mere instrumentality of another is that the two are treated as one for purposes of assessing liability for the alleged wrong, and are jointly and severally liable. Accordingly, submitting separate issues of punitive damages as to each defendant was error.

II.

**[2]** Defendants next argue that the trial court submitted the case to the jury on an erroneous theory of hospital liability that does not exist under the law of North Carolina. As to the theory in question, the trial court instructed: "[A] hospital is under a duty not to have policies or practices which operate in a way that interferes with the ability of a physician to exercise his medical judgment. A violation of this duty would be negligence." The jury found that there existed "a policy or practice which required physicians to discharge patients when their insurance benefits expire and which interfered with the exercise of Dr. Barnhill's medical judgment." Defendants contend that this theory of liability does not fall within any theories previously accepted by our courts.

In *Blanton v. Moses H. Cone Memorial Hospital, Inc.*, 319 N.C. 372, 354 S.E.2d 455 (1987), our Supreme Court held that the appropriate standard for determining whether a valid claim exists against a hospital is the standard of the ordinary, reasonable, and prudent person. *Id.* at 375, 354 S.E.2d at 457. The Court further stated:

'Actionable negligence is the failure of one owing a duty to another to do what a reasonable and prudent man would ordinarily have done, or doing what such a person would not have done, which omission or commission is the proximate cause of injury to another.'

*Id.* (quoting S. Speiser, et al., *The American Law of Torts* § 9.1, at 995 (1983)).

Our Supreme Court has recognized that hospitals in this state owe a duty of care to their patients. *Id.* In *Burns v. Forsyth County Hospital Authority, Inc.*, 81 N.C. App. 556, 563, 344 S.E.2d 839, 845 (1986), this Court held that a hospital has a duty to the patient to obey the instructions of a doctor, absent the instructions being obviously negligent or dangerous. Another recognized duty is the duty to make a reasonable effort to monitor and oversee the treatment prescribed and administered by doctors practicing at the hospital. *Bost v. Riley*, 44 N.C. App. 638, 647, 262 S.E.2d 391, 396, *disc. review denied*, 300 N.C. 194, 269 S.E.2d 621 (1980). In light of these holdings, it seems axiomatic that the hospital has the duty not to institute policies or practices which interfere with the doctor's medical judgment. We hold that pursuant to the reasonable person standard, Charter Hospital had a duty not to institute a policy or practice which required that patients be discharged when their insurance expired and which interfered with the medical judgment of Dr. Barnhill.

III.

[3] Defendants next argue that even if the theory of negligence submitted to the jury was proper, the jury's finding that Charter Hospital had such a practice was not supported by sufficient evidence. The issue before us is whether the trial court erred in denying defendants' motion for judgment notwithstanding the verdict. In reviewing the denial of a defendant's motion for judgment notwithstanding the verdict, the question is whether the evidence, when viewed in the light most favorable to the plaintiff, giving the plaintiff the benefit of every reasonable inference, was sufficient to go to the jury. *Schwartzbach v. Apple Baking Co.*, 109 N.C. App. 216, 218, 426 S.E.2d 438, 439 (1993). We conclude that in the case at hand, the evidence was sufficient to go to the jury.

Plaintiffs' evidence included the testimony of Charter Hospital employees and outside experts. Fernando Garzon, Joe's nursing therapist at Charter Hospital, testified that the hospital had a policy of

discharging patients when their insurance expired. Specifically, when the issue of insurance came up in treatment team meetings, plans were made to discharge the patient. When Dr. Barnhill and the other psychiatrists and therapists spoke of insurance, they seemed to lack autonomy. For example, Garzon testified, they would state, "So and so is to be discharged. We must do this." Finally, Garzon testified that when he returned from a vacation, and Joe was no longer at the hospital, he asked several employees why Joe had been discharged and they all responded that he was discharged because his insurance had expired. Jane Sims, a former staff member at the hospital, testified that several employees expressed alarm about Joe's impending discharge, and that a therapist explained that Joe could no longer stay at the hospital because his insurance had expired. Sims also testified that Dr. Barnhill had misgivings about discharging Joe, and that Dr. Barnhill's frustration was apparent to everyone. One of plaintiffs' experts testified that based on a study regarding the length of patient stays at Charter Hospital, it was his opinion that patients were discharged based on insurance, regardless of their medical condition. Other experts testified that based on Joe's serious condition on the date of discharge, the expiration of insurance coverage must have caused Dr. Barnhill to discharge Joe. The experts further testified as to the relevant standard of care, and concluded that Charter Hospital's practices were below the standard of care and caused Joe's death. We hold that this evidence was sufficient to go to the jury.

Defendants further argue that the evidence was insufficient to support the jury's finding that Charter Hospital engaged in conduct that was willful or wanton. An act is willful when it is done purposely and deliberately in violation of the law, or when it is done knowingly and of set purpose, or when the mere will has free play, without yielding to reason. *King v. Allred*, 76 N.C. App. 427, 431, 333 S.E.2d 758, 761, *disc. review denied*, 315 N.C. 184, 337 S.E.2d 857 (1985). It is wanton when it is done of wicked purpose, or when it is done needlessly, with reckless indifference to the rights of others. *Id.* at 432, 333 S.E.2d at 761. We conclude that the jury could have reasonably found from the above-stated evidence that Charter Hospital acted knowingly and of set purpose, and with reckless indifference to the rights of others. Therefore, we hold that the finding of willful or wanton conduct on the part of Charter Hospital was supported by sufficient evidence.

IV.

[4] Defendants' next argument is that the trial court erred in not granting their motion for judgment notwithstanding the verdict, on the ground that the negligent acts of the Muses and Dr. Barnhill were superseding causes of Joe's death. Defendants' contention is that the superseding negligence of the Muses and Dr. Barnhill insulated the negligence of Charter Hospital as a matter of law, and that, therefore, the hospital's negligence was not a proximate cause of the suicide.

The doctrine of superseding, or intervening, negligence is well established in our law. In order for an intervening cause to relieve the original wrongdoer of liability, the intervening cause must be a new cause, which intervenes between the original negligent act and the injury ultimately suffered, and which breaks the chain of causation set in motion by the original wrongdoer and becomes itself solely responsible for the injury. *Hayes v. City of Wilmington*, 243 N.C. 525, 540, 91 S.E.2d 673, 685 (1956). The intervening cause must be an independent force which turns aside the natural sequence of events set in motion by the original wrongdoer and produces a result which would not otherwise have followed, and which could not have been reasonably anticipated. *Id.* at 540-41, 91 S.E.2d at 685. The rule in this jurisdiction is that except in cases so clear that there can be no two opinions among fair-minded people, the question should be left for the jury to determine whether the intervening act and the resultant injury were such that the original wrongdoer could reasonably have expected them to occur as a result of his own negligence. *Hairston v. Alexander Tank & Equip. Co.*, 310 N.C. 227, 238, 311 S.E.2d 559, 567 (1984).

The evidence, when viewed in the light most favorable to plaintiffs, with all reasonable inferences being afforded to plaintiffs, tended to show that the hospital had a policy of requiring the discharge of patients when their insurance expired and that this policy interfered with Dr. Barnhill's medical judgment regarding Joe's discharge. Dr. Barnhill was thereby put in a position such that he could not disclose the severity of Joe's condition to the Muses. He then discharged Joe, transferring him to outpatient treatment at the public facility. Any negligence of Dr. Barnhill in discharging Joe and in not warning the Muses, or of the Muses, in not properly supervising Joe after discharge, did not turn aside the natural sequence of events set in motion by the hospital's misconduct. *See Hayes*, 243 N.C. at 540-41, 91 S.E.2d at 685. Rather, the alleged intervening acts, in the natural and

ordinary course of things, could have been anticipated by defendants as not entirely improbable. *Id.* at 541, 91 S.E.2d at 685. Thus, the hospital's negligence was not superseded, and thereby insulated, as a matter of law. Accordingly, the trial court properly denied defendants' motion for judgment notwithstanding the verdict.

Defendants also contend that the trial court erred in directing a verdict for plaintiffs on the issue of whether Dr. Slonaker's alleged negligence was a superseding cause of Joe's death. In reviewing the granting of a directed verdict, the question is whether the evidence, when viewed in the light most favorable to the non-movant, and giving the non-movant the benefit of every reasonable inference, was sufficient to go to the jury. *Parrish Funeral Home, Inc. v. Pittman,* 104 N.C. App. 268, 269, 409 S.E.2d 327, 329 (1991). When viewed in this light, the evidence tended to show that Joe saw Dr. Slonaker at the Mental Health Authority on two occasions after his discharge from Charter Hospital, that Dr. Slonaker had reviewed Joe's discharge summary, and that Joe reported to Dr. Slonaker that he was still having hallucinations. Further, one of plaintiffs' experts testified that Dr. Slonaker's treatment was "[s]o totally inadequate that he could possibly not have had [the documents in Joe's Charter Hospital file] to review, or if he did review them, he paid no damned attention to them." However, defendants have pointed to no evidence in the record which tends to show that Dr. Slonaker's treatment of Joe was a cause of Joe's suicide. Thus, there was not sufficient evidence to submit to the jury the issue of whether Dr. Slonaker's alleged negligence was a superseding cause of Joe's death, and the trial court did not err in directing a verdict for plaintiffs on this issue.

[5] Defendants next contend that Joe's suicide was a superseding cause of his death and that the trial court erred in granting summary judgment for plaintiffs on the issue. This question is apparently one of first impression in this state. However, we cannot agree with defendants' contention. The rule must be that where a psychiatric hospital has assumed the care of a suicidal patient, and as a result of its negligence, the patient commits suicide, the hospital cannot claim that the suicide was a superseding cause, insulating the hospital from liability. *See Cockrum v. State,* 843 S.W.2d 433 (Tenn. Ct. App. 1992) (*appeal denied* Dec. 7, 1992). Were the rule otherwise, the wrongdoer "could become indifferent to the performance of his duty [to care for the suicidal patient] knowing that the very eventuality that he was under a duty to prevent would, upon its occurrence, relieve him from responsibility." *Hunt v. King County,* 481 P.2d 593, 598 (Wash. Ct.

App.), *review denied*, 79 Wash. 2d 1001 (1971). Accordingly, we conclude that the trial court properly granted summary judgment in favor of plaintiffs on this issue.

## V.

Defendants' next argument is that the contributory negligence of the Muses bars their recovery as beneficiaries of Joe's estate. This argument is without merit, however, as contributory negligence does not bar recovery in a wrongful death action where, as here, the defendants' conduct was found to be wanton or willful. *Brewer v. Harris*, 279 N.C. 288, 297, 182 S.E.2d 345, 350 (1971).

## VI.

Defendants next contend that the trial court erred in admitting certain testimony by plaintiffs' experts. However, in each instance, the first time such testimony was offered, defendants failed to object. Thus, the subsequent admission of similar testimony over objection was not prejudicial error. *Fidelity Bank v. Garner*, 52 N.C. App. 60, 64, 277 S.E.2d 811, 813-14 (1981). Accordingly, defendants' contention is without merit.

## VII.

[6] Next, we address defendants' arguments that the award of punitive damages violated due process. Defendants first argue that pursuant to *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 113 L. Ed. 2d 1 (1991), the trial court must articulate a detailed postjudgment analysis of a jury's award of punitive damages, and that the failure to do so violates due process. However, in the recent case of *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. ——, 125 L. Ed. 2d 366 (1993), decided after the trial of the instant case, the Court held that such an articulation is not required by the Constitution. *Id.* at ——, 125 L. Ed. 2d at 383-84. Moreover, in the present case, the trial court complied with defendants' request that it review the verdict. Contrary to defendants' assertions on appeal, the court did give a detailed and thoughtful analysis regarding the propriety of the verdict, listing the factors relevant to its decision.

Defendants next argue that North Carolina's limited postjudgment review of damages for excessiveness is constitutionally deficient. However, as previously stated, the trial court in the instant case conducted a detailed review of the jury's award of punitive damages, pursuant to defendants' request. Accordingly, defendants will

not be heard to complain that the traditional excessiveness review is unconstitutional since the trial court modified the procedure at defendants' request.

[7] Defendants further argue that the award of punitive damages in the present case was unconstitutional, as it was six times the award of compensatory damages. Defendants cite *Haslip* for the proposition that awards of punitive damages which are more than four times the amount of compensatory damages awarded are at the line of constitutional impropriety. However, the Court, in subsequently upholding an award of punitive damages in *TXO* which was more than 526 times greater than the actual damages awarded, held that there can be no bright line between what is constitutionally acceptable and what is constitutionally unacceptable. *TXO*, 509 U.S. at ——, 125 L. Ed. 2d at 379. The Court stated that the concern is a general concern of reasonableness, taking into account the purposes of punitive damages, such as punishment and deterrence. *Id.* In the case at hand, we conclude that the award of punitive damages was reasonable, taking into account the facts of the case and the purposes of punitive damages.

[8] Defendants next argue that due process requires that punitive damages be based on conduct which is intentional or willful and that the burden of proof should be higher than a preponderance of the evidence. However, defendants' requested instruction on punitive damages stated that the burden of proof was "by the greater weight of the evidence" and that the award could be properly based on "gross, willful or wanton" conduct. Defendants may not now complain that the instruction was erroneous. *Blow v. Shaughnessy*, 88 N.C. App. 484, 492, 364 S.E.2d 444, 448 (1988). Furthermore, the Court in *Haslip* held that due process does not require more than a preponderance of the evidence. *Haslip*, 499 U.S. at 23 n.11, 113 L. Ed. 2d 1, at 23 n.11.

Defendants' next contention is that due process requires that evidence of a defendant's net worth be excluded, or only allowed in after the jury has determined that punitive damages should be awarded. In *TXO*, however, the Court held that under well-settled law, a defendant's net worth is properly considered in assessing punitive damages. *TXO*, 509 U.S. at —— n.28, 125 L. Ed. 2d at 382 n.28. Furthermore, in the present case, the trial court only admitted evidence of defendants' net worth after it determined that plaintiffs had made a prima facie case warranting the imposition of punitive damages. We believe that this comports with the requirements of due process.

Defendants further argue that the verdict was based on bias and prejudice, as the jury was allowed to hear evidence of defendants' financial condition that was not current. After a *voir dire* of plaintiffs' witness who was to testify as to defendants' financial condition, the trial court ruled that certain evidence would not be relevant to a determination of defendants' current financial condition. The court ruled that other evidence, including that about which defendants now complain, was relevant. Specifically, defendants point to testimony regarding the per share value of Charter Medical's common stock as of 31 December 1989. However, the witness testified that this value was adopted by Charter Medical in its filings with the Securities and Exchange Commission for the fiscal year ending September 1990. We note that the complaint in this case was filed in August 1988, and the trial began in October 1991. Accordingly, we hold that the admission of the evidence in question was sufficiently current so as not to result in a verdict based on bias or prejudice.

## VIII.

Defendants' next contention is that the trial court erred in granting plaintiffs' motion to reconsider an order of the court which granted summary judgment against plaintiffs on the issue of punitive damages. Pursuant to N.C.G.S. § 1A-1, Rules 59 and 60 (1990), plaintiffs filed a motion for reconsideration on the ground that they had newly discovered evidence which tended to prove their claim of punitive damages. After reviewing the motion and accompanying affidavits, the trial court granted plaintiffs' motion to reconsider. Upon reconsidering the order of summary judgment, the trial court reversed the order. Defendants contend that plaintiffs' motion for reconsideration under Rule 59 was not timely filed and was not based on newly discovered evidence. We disagree.

Defendants contend that entry of judgment occurred on 12 February 1991, when summary judgment was entered in open court, and that plaintiffs' motion for reconsideration was not filed until 1 March 1991, more than ten days after entry of judgment. We note that Rule 59 requires that the motion be served, not filed, within ten days after entry of judgment. Nevertheless, in this case the motion was both served and filed on 1 March. With the consent of the parties, the trial court delayed entry of summary judgment until 19 February 1991 for the specific purpose of giving plaintiffs more time to evaluate the newly discovered evidence to determine whether it supported a motion for reconsideration. On 19 February, the trial judge signed and

filed the written order of summary judgment. Thus, plaintiffs' 1 March motion was served within ten days of entry of judgment, as required by Rule 59(b).

Defendants also contend that the motion for reconsideration was not based on newly discovered evidence. Defendants, however, did not assert this contention as a ground for their assignment of error. Therefore, the issue is not properly before us. N.C.R. App. P. 10(c) (1994); *Kimmel v. Brett*, 92 N.C. App. 331, 374 S.E.2d 435 (1988). Nevertheless, we note that the standard of review when a new trial is granted pursuant to Rule 59 is whether the trial court abused its discretion, *Corwin v. Dickey*, 91 N.C. App. 725, 729, 373 S.E.2d 149, 151 (1988), *disc. review denied*, 324 N.C. 112, 377 S.E.2d 231 (1989). Defendants have shown no abuse of discretion in this case.

## IX.

**[9]** Next, defendants contend that the trial court erred in not granting their motion for a new trial based on allegations of juror misconduct. Defendants argue that one of the jurors was prejudicially untruthful during *voir dire* in that she did not state that her daughter had experienced suicidal thoughts during adolescence, and that during the trial the juror told the other jurors this fact about her daughter. After the trial, the court held a hearing on the matter. The court found that during the *voir dire*, the juror in question

> was asked some very specific questions by the Court, which resulted in her disclosing that she had been the subject of physical abuse, that her daughter had had emotional problems, and that she had experience [sic] of having lost a family member by way of suicide. And all of that information was available to the defendants at the time that they had the prospective juror . . . under consideration, and could have made a motion for—to have her excused for cause or to have exercised a peremptory challenge.

We conclude that the trial court did not abuse its discretion, and therefore did not err in denying defendants' motion for a new trial.

## X.

Finally, defendants contend that the cumulative effect of the errors committed by the trial court requires that defendants have a new trial. We find this argument to be without merit. As stated in section I. of this opinion, the trial court erred in instructing the jury on

punitive damages, and the case must be remanded for a new trial on the issue of punitive damages alone. Beyond this, however, defendants have shown no other error at trial.

For the reasons stated, we find no error in the judgment of the trial court, except for that part of the judgment awarding punitive damages, which is reversed and remanded for proceedings consistent with this opinion.

No error in part, reversed in part and remanded.

Judge WYNN concurs.

Judge ORR dissents.

Judge ORR dissenting.

After a careful review of the record and applicable law, I must respectfully dissent from the majority on the submission of the issue on wilful or wanton conduct. While recognizing the severe emotional impact of the facts surrounding the case, my research concludes that there was insufficient evidence to warrant the submission of wilful and wanton conduct by defendant to the jury. Therefore, in my opinion, the damage awards that were predicated on the jury's positive answer to the wilful or wanton conduct issue must fail.

Plaintiffs contend that acts of the defendant hospital constituted negligence in that (1) there was a policy or practice of requiring physicians to discharge patients from the hospital when their insurance benefits expired, and (2) defendant allowed this policy or practice to operate in a way that interfered with Dr. Barnhill's medical judgment, thereby causing Dr. Barnhill to discharge Joseph Muse, III in a medically-inappropriate manner.

For purposes of this analysis, we can assume that there was such a policy and that there was some evidence from which a jury could find that this policy influenced or interfered with Dr. Barnhill's medical judgment and his decision to discharge Joseph Muse, III. That being the case, plaintiff arguably has made out a case of negligence and the jury so determined. However, the crux of the case rests squarely on the issue of whether the evidence, taken in a light most favorable to the plaintiff, is sufficient to submit the further issue of wilful or wanton conduct to the jury.

Our Supreme Court in *Akzona, Inc. v. Southern Railway Co.*, 314 N.C. 488, 495-96, 334 S.E.2d 759, 763 (1985), defined wilful and wanton conduct as follows:

> An act is done wilfully when it is done purposely and deliberately in violation of law, or when it is done knowingly and of set purpose, or when the mere will has free play, without yielding to reason. 'The true conceptions of wilful negligence involves a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract, or which is imposed on the person by operation of law.'

> An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.

(Citations omitted.) Further,

> While "[o]rdinary negligence has as its basis that a person charged with negligent conduct should have known the probable consequences of his act," we have said "[w]anton and willful negligence rests on the assumption that he knew the probable consequences, but was recklessly, wantonly or intentionally indifferent to the results."

*Id.* at 496, 334 S.E.2d at 763-64 (citation omitted).

Turning now to the facts of this case, there is, as previously noted, evidence that defendant hospital had a policy or practice of discharging patients when their insurance ran out. This practice was obviously done for a business purpose; however, the evidence reveals that the policy was subject to being overridden on occasion by request of the treating physician or other financial consideration. Although there also was some evidence that this policy may have affected Dr. Barnhill's decision to discharge the plaintiffs' son, such evidence, while perhaps supporting a negligence theory, does not go beyond that.

Dr. Barnhill testified that the policy did not influence his decision, and more importantly, that a range of treatment options including a state psychiatric hospital were available for the patient. No evidence was presented that could lead a jury to conclude that the policy in question involved a deliberate purpose not to discharge some duty necessary to the safety of the person in question. While it can be said

that the policy to discharge was deliberate, there is no evidence that the hospital expected, anticipated or intended for the patient to be released in circumstances that put the person's safety in jeopardy. In fact, Joseph Muse, III was discharged into the custody and care of another physician and a community based mental health facility as well as the care of his parents with specific instructions for his care.

The trial court instructed the jury that ". . . a hospital is under a duty not to have policies or practices which operate in a way that interferes with the ability of a physician to exercise his medical . . . judgment. A violation of this duty would be negligence."

While the jury found that defendant was negligent, I find insufficient evidence to raise the defendant's conduct to the level required to submit the issue of wilful and wanton conduct to the jury. A policy to terminate a patient's hospitalization based upon insurance benefits ending in and of itself is not wilful or wanton conduct. To sustain plaintiff's contention there must be, according to our law, a deliberate purpose not to discharge a duty necessary for a person's safety. If the hospital had simply discharged the patient with no referral to another physician or medical facility, then a cognizable claim for wilful or wanton conduct would have been established. Such was not the case here, as I read the record, and although Dr. Barnhill's care in discharging the patient may well have been negligent, there is nothing to suggest that the hospital's policy or its implementation by Dr. Barnhill was done with reckless or deliberate disregard for the patient's safety. Therefore, I conclude that the trial court erred in submitting the issue of wilful and wanton conduct to the jury and would accordingly vote to reverse.