SUNSET BEACH DEVELOPMENT, LLC, Plaintiff-Appellant v. AMEC, INC.; AMEC
    EARTH & ENVIRONMENTAL, INC.; AMEC EARTH & ENVIRONMENTAL, INC. OF
    NORTH CAROLINA; MICHAEL T. BALL; ROBERT L. BELLAMY & ASSOCIATES,
    INC.; GGSH ASSOCIATES; JERRY L. SELLERS; SUE GORE TYSON AND JULIE
    GORE MONROE, IN THEIR CAPACITY AS EXECUTRICES OF THE ESTATE OF JULIAN
    DALE GORE; FRANKLIN DALE GORE; AND RICHARD P. HERDMAN, DEFENDANTS-
    APPELLEES

No. COA08-324

(Filed 7 April 2009)

**1. Real Estate— sale of coastal land for development—wet-
lands—fraud**

Summary judgment was properly granted for defendants on a
fraud claim arising from their sale of coastal land for develop-
ment. The representatives of plaintiff and defendant were sophis-
ticated businessmen with experience in real property develop-
ment in coastal communities, plaintiff had unfettered access to
the tract, and plaintiff chose to purchase the land despite clear
deficiencies in the wetlands delineations and the Master Wetlands
Map. Plaintiff did not reasonably rely on any misrepresentations
made by defendants.

**2. Unfair Trade Practices— sale of coastal land for develop-
ment—wetlands—reasonable reliance on information**

The trial court did not err by granting defendants' motion
for summary judgment on an unfair and deceptive trade practice
in an action arising from defendants' sale of coastal land for
development. Plaintiff had experience in developing coastal com-
munities and had unfettered access to the tract, and the wet-
lands delineations and map were so facially flawed that plaintiff
could not have reasonably relied on them in deciding to purchase
the tract.

**3. Real Estate— sale of coastal land for development—wet-
lands—warranties**

Summary judgment should not have been granted for defend-
ants on a breach of contract claim arising from defendants' sale
of coastal land for development. The contract included war-
ranties that there were no known violations of environmental
laws, but there was evidence that required permits may not
have been obtained and that drainage activities may have vio-
lated regulations.

**4. Real Estate— sale of coastal land for development—breach of contract—amount of wetlands—merger with deed**

The trial court did not err by granting summary judgment for defendants in a breach of contract claim arising from defendants' sale of coastal property where the claim focused on a representation of the amount of wetlands in the tract. Unlike the section of the contract regarding environmental violations, there is no evidence that plaintiff and defendants intended the section of the contract concerning the amount of wetlands to survive closing. This provision merged with the deed at closing and plaintiff's opportunity to avail itself of the provision was lost.

**5. Real Estate— covenant of good faith and fair dealing—wetlands—summary judgment**

The trial court erred by granting summary judgment for defendants on a claim for breach of the covenant of good faith and fair dealing in an action arising from defendants' sale of coastal real estate for development. There are issues of material fact yet to be decided relevant to this claim.

**6. Real Estate— rescission—sale of coastal real estate— reliance on wetlands map—not reasonable**

The trial court did not err by granting summary judgment for defendants on a claim for rescission in an action arising from defendants' sale of coastal real estate for development. Plaintiff argued that its mistake about the size of the wetlands in the tract was induced by misrepresentation, but reliance on a wetlands map that was deficient on its face was not reasonable, nor did the map provide sufficient knowledge of the wetlands to justify the mistake.

**7. Damages and Remedies— reserved for trial—summary judgment not proper**

The trial court erred by granting summary judgment for defendants on any issue related to damages in an action arising from the sale of coastal real estate for development where the court had stated that damages would be addressed at trial if plaintiffs' claim survived summary judgment.

**8. Evidence— spoiliation—summary judgment—not applicable**

The trial court erred by granting summary judgment for defendant based on spoiliation in an action arising from the sale of coastal real estate for development. Spoiliation lies within the

province of the trier of fact and cannot, by its mere existence, be determinative of a claim.

Appeal by Plaintiff from order entered 16 November 2007 by Judge D. Jack Hooks, Jr. in Superior Court, Brunswick County. Heard in the Court of Appeals 22 September 2008.

*Lewis & Roberts, PLLC, by James A. Roberts, III, Kimberly R. Wilson, and Matthew C. Bouchard, for Plaintiff-Appellant.*

*Crossley McIntosh Collier Hanley & Edes, PLLC, by Clay A. Collier and Justin K. Humphries, for Defendants-Appellees.*

McGEE, Judge.

Sunset Beach Development, LLC (Plaintiff) was formed in 2002 for the purpose of identifying and acquiring undeveloped real property for development and resale. The majority members of Sunset Beach are corporate entities owned by Ralph Teal (Teal) and Blair Tanner (Tanner). Plaintiff began the process of acquiring four separate but contiguous parcels of land (the four tracts) in Brunswick County, North Carolina from four separate owners in late summer 2002. Plaintiff prepared its preliminary land plan for development of the four tracts in early 2003, subject to the required delineation of jurisdictional wetlands. Plaintiff intended to develop the four tracts into a residential development if the delineation of jurisdictional wetlands established that development was feasible on the four tracts.

Plaintiff entered into contracts of sale in 2003 with the four owners. Plaintiff closed with one owner in August 2003. Plaintiff closed with the remaining three owners in November 2003, including the contract of sale with Defendant GGSH Associates (GGSH) for the purchase of GGSH's 453-acre parcel (the GGSH tract) for $4,500,000.

Tanner's father, Don Tanner, developed Sandpiper Bay, which abuts the land purchased by Plaintiff, through a business entity he controlled. During the early to mid-1990s, Don Tanner considered purchasing the GGSH tract, and in 1998 hired Michael Ball (Ball) to conduct a "wetlands assessment" of the GGSH tract. At that time, Ball was the president of East Coast Environmental Consultants, Inc. Relevant to the instant case, Ball was a senior project manager for AMEC, Inc., AMEC Earth & Environmental, Inc., and AMEC Earth & Environmental, Inc. of North Carolina (collectively AMEC). Ball's wetlands assessment of the GGSH tract estimated that approximately

**SUNSET BEACH DEV., LLC v. AMEC, INC.**

[196 N.C. App. 202 (2009)]

seventy percent of it was uplands and thirty percent was wetlands. Don Tanner did not purchase the GGSH tract.

GGSH also hired Ball in 1999 to perform a wetlands assessment of the GGSH tract. Ball's 1999 assessment of the GGSH tract indicated areas of wetlands and provided "an approach to utilizing such areas for development or marketing purposes." Ball's assessment of the GGSH tract concluded that about "112.2 acres of the [GGSH tract] could be considered wetlands." Jerry L. Sellers (Sellers), a general partner in GGSH, disagreed with Ball's assessment of the amount of wetlands in the GGSH tract and told Ball he thought there were fewer acres of wetlands on the GGSH tract.

The GGSH tract was the linchpin of Plaintiff's planned development. Between the time Plaintiff showed interest in purchasing the GGSH tract and the time Plaintiff closed the sale, GGSH provided Gene Blanton (Blanton), an employee of Plaintiff, with a key to the GGSH tract, giving Plaintiff unfettered access to it.

As stated above, Plaintiff and GGSH entered into a contract of sale for the GGSH tract on 18 April 2003. The contract of sale contained certain environmental warranties in which GGSH warranted and represented that "[t]here are no known violations of environmental laws on or which have occurred with respect to the [GGSH tract.]" The contract of sale also stated that Plaintiff's obligation to close was contingent on GGSH's providing Plaintiff with "a wetlands delineation approved by the [United States Army Corps of Engineers], which shall not vary more than three (3) acres over or under twenty-five (25) acres. A price adjustment shall be negotiated if the variation is greater or less than three (3) acres." GGSH hired Ball to perform the required wetlands delineation on the GGSH tract. GGSH never provided Plaintiff with a delineation of the GGSH tract before closing.

Plaintiff hired Ball to perform the wetlands delineations for the three contiguous tracts not owned by GGSH. Plaintiff also asked Ball to produce a composite map of all four tracts (the Master Wetlands Map), which was received on 29 August 2003.

Prior to the signing of the contract of sale between Plaintiff and GGSH, Ball informed GGSH that the effects of drainage ditches had reduced the jurisdictional wetlands on the GGSH tract to twenty-five acres. Plaintiff argues that the "twenty-five acres of wetlands" referred to in the contract of sale is based on representations made by Ball to Sellers, who in turn made those representations to Plaintiff.

SUNSET BEACH DEV., LLC v. AMEC, INC.

[196 N.C. App. 202 (2009)]

Plaintiff also asserts that Sellers admitted to representing to Plaintiff that there were twenty-five acres of wetlands on the GGSH tract.

Plaintiff's engineering firm was Robert L. Bellamy & Associates, Inc. (Bellamy). John Poston (Poston), a licensed professional engineer, was the main Bellamy engineer responsible for overseeing Bellamy's work. Poston received a composite wetlands map, including the GGSH tract, from Ball on 19 August 2003. Poston informed Plaintiff on or about 25 August 2003 that "the wetland[s] information received was not sufficient for design due to the lack of information concerning wetland size, type and directional/distance ties to an established property boundary." Poston noted that the only date on the map was 9 January 1998. Poston also questioned whether, in addition to the signed plat depicting the location and extent of the wetlands on the GGSH tract, the United States Army Corps of Engineers (the Corps) was required to issue a separate letter of wetlands certification.

Teal, one of Plaintiff's majority members, also raised concerns about Ball's wetlands delineations and advised Poston to do whatever was necessary to ensure the wetlands issues were properly addressed. Poston requested and received from Ball the Master Wetlands Map on 29 August 2003. This map provided the information that was missing from the map Poston received on 19 August 2003. Plaintiff's corporate attorney, Larry Ferree (Ferree), testified that Teal raised concerns to him about the Master Wetlands Map.

Sellers testified that at some point before closing, he offered to pay Ball $90,000 for Ball's work so long as the sale occurred for the original purchase price of $4,500,000. Plaintiff contends it was unaware of this agreement between Ball and GGSH. Plaintiff contends Ball led Plaintiff to believe Ball's delineation work would cost GGSH "about $15,000." Plaintiff asserts that because of this contingent payment of $90,000 to Ball, Ball forged the name of Allen Davis (Davis), a prior employee of the Corps, on five wetlands maps, including a map showing twenty-five acres of wetlands on the GGSH tract. Ball admitted in his deposition that, rather than performing an actual delineation on the GGSH tract, he used AutoCAD software to "shrink" the wetlands depicted on the 1999 assessment he prepared of the GGSH tract. By using the AutoCAD software, the wetlands depicted on Ball's 1999 assessment were shown to be twenty-five acres.

A few days after the sale closed, Sellers met Ball at a steakhouse outside Myrtle Beach and paid Ball $90,000. Ball was paid by a check

made out to "Todd Ball" and not to his employer, AMEC. Ferree testified in his deposition that had he been aware of the undisclosed $90,000 payment, he did "not think we would be here." Plaintiff claims it was not aware of the $90,000 payment to Ball until an official from the North Carolina Department of Natural Resources, Division of Water Quality (DWQ) advised Poston that neither the Corps nor DWQ could verify that the wetlands delineations for the GGSH tract and the other three contiguous lots were valid. Plaintiff received a letter from the Corps on 1 March 2004 stating the Corps never received a verified wetlands delineation from Ball, and that if this problem was not remedied within ten days, work on the GGSH tract must cease, and the drained wetlands must be restored to their prior condition.

Plaintiff filed a complaint in Superior Court, Mecklenburg County on 24 August 2004 against GGSH; AMEC, Inc.; AMEC Earth & Environmental, Inc.; AMEC Earth & Environmental, Inc. of North Carolina; Michael T. Ball; Robert L. Bellamy & Associates, Inc.; Jerry L. Sellers; Julian Dale Gore; Franklin Dale Gore; and Richard P. Herdman. GGSH, along with Defendants Jerry L. Sellers, Julian Dale Gore, Franklin Dale Gore, and Richard P. Herdman filed an answer and motions for change of venue on 17 December 2004. The trial court entered an order on 4 May 2005 transferring the action to Superior Court, Brunswick County.

Plaintiff filed a motion on 30 August 2005 to substitute as defendants Sue Gore Tyson and Julie Gore Monroe in their capacity as joint executors of the Estate of Julian Dale Gore. Plaintiff also filed a motion for leave to file its first amended complaint on 16 October 2006. The trial court allowed Plaintiff's motions in an order dated 16 February 2007. Plaintiff thereafter filed its first amended complaint.

Plaintiff voluntarily dismissed with prejudice all claims against Defendant Robert L. Bellamy & Associates, Inc. on 23 May 2007. Plaintiff voluntarily dismissed with prejudice its claims against Defendants AMEC, Inc.; AMEC Earth & Environmental, Inc.; and AMEC Earth & Environmental, Inc. of North Carolina on 24 October 2007. The trial court stayed Plaintiff's claims against Ball in its 16 November 2007 summary judgment order. Therefore, the remaining defendants in the instant appeal are GGSH; Jerry L. Sellers; Franklin Dale Gore (Gore); Richard P. Herdman; and Sue Gore Tyson and Julie Gore Monroe in their capacity as joint executors of the Estate of Julian Dale Gore (Defendants). Plaintiff's amended complaint includes claims against Defendants for: (1) breach of contract, (2)

fraud, (3) unfair and deceptive trade practices, (4) breach of covenant of good faith and fair dealing, and (5) rescission of the executed real estate contract on the ground of mutual mistake of material fact. Defendants filed an answer to Plaintiff's amended complaint on 2 April 2007.

Defendants filed a motion for summary judgment pursuant to N.C. Gen. Stat. § 1A-1, Rule 56 on 31 August 2007. The trial court entered an order dated 16 November 2007 allowing Defendants' motion for summary judgment and dismissing Plaintiff's claims with prejudice. The trial court certified the matter for immediate appeal pursuant to N.C. Gen. Stat. § 1A-1, Rule 54(b). Plaintiff appeals the trial court's summary judgment order. Additional facts will be included in the body of our opinion.

I.

**[1]** In Plaintiff's first argument, it contends that the trial court erred in granting Defendants' motion for summary judgment because genuine issues of material fact exist as to Plaintiff's fraud claim and the defenses of lack of reasonable reliance and *caveat emptor*. We disagree.

A motion for summary judgment should be granted upon a showing "that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2007). "On appeal, an order allowing summary judgment is reviewed *de novo*." *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004) (citation omitted).

A plaintiff makes out a *prima facie* case for fraud by establishing:

(a) that [the] defendant made a representation relating to some material past or existing fact; (b) that the representation was false; (c) that when he made it [the] defendant knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (d) that the defendant made the false representation with the intention that it should be acted on by the plaintiff; (e) that the plaintiff reasonably relied upon the representation and acted upon it; and (f) that the plaintiff suffered injury.

*Bolick v. Townsend Co.*, 94 N.C. App. 650, 652, 381 S.E.2d 175, 176 (1989) (emphasis omitted). Our Court has previously held that "[s]ummary judgment is generally inappropriate in an action alleging

fraud, as the existence of fraud must include fraudulent intent which is usually proven by circumstantial evidence." *Id.* (citations omitted); *see also Parker v. Bennett*, 32 N.C. App. 46, 54, 231 S.E.2d 10, 15 (1977) (in actions for fraud "where motives, intent, subjective feelings and reactions, consciousness and conscience, are to be searched, the issues may not be disposed of on summary judgment").

In the present case, however, summary judgment is appropriate because Plaintiff failed to show that it reasonably relied on the representations of Defendants regarding wetlands delineations. In cases involving the purchase of real property,

> "[r]eliance is not reasonable if a plaintiff fails to make any independent investigation" unless the plaintiff can demonstrate: (1) "it was denied the opportunity to investigate the property," (2) it "could not discover the truth about the property's condition by exercise of reasonable diligence," or (3) "it was induced to forego additional investigation by the defendant's misrepresentations."

*RD&J Properties v. Lauralea-Dilton Enters., LLC*, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499 (2004) (quoting *State Properties, LLC v. Ray*, 155 N.C. App. 65, 73, 574 S.E.2d 180, 186 (2002)). In *RD&J Properties*, we held the plaintiff did not reasonably rely on the defendants' representations where the parties were dealing at arm's length; the parties were all sophisticated businessmen; two of the plaintiff's partners were experienced in operating mobile home parks; the plaintiff voluntarily purchased the parks which specifically included the septic system "as is"; the defendants did not deny the plaintiff an opportunity to inspect the property; and the defendants did not engage in any artifice designed to induce the plaintiff to forego an investigation. *RD&J Properties*, 165 N.C. App. at 746-47, 600 S.E.2d at 499-500.

In *MacFadden v. Louf*, 182 N.C. App. 745, 643 S.E.2d 432 (2007), our Court held that summary judgment was appropriate in an action for fraud in which the plaintiff claimed to have relied on a "Residential Disclosure Statement" provided by the defendant and a letter from a sheet metal company which stated that there were no leaks in the residence the plaintiff was purchasing. *Id.* at 748-49, 643 S.E.2d at 435. We held that the plaintiff "failed to establish that her reliance was justifiable because she conducted a home inspection before closing and that inspection report put her on notice of potential problems with the home." *Id.* at 748, 643 S.E.2d at 434. The plaintiff failed to follow the instructions in the home inspection she commissioned, which included that she "have a roofing contractor inspect

the roof because there was potential for water to pond above the kitchen/breeze-way area." *Id.* Accordingly, our Court held that the plaintiff's reliance on the residential disclosure statement was unreasonable as a matter of law. *Id.* at 748-49, 643 S.E.2d at 435.

In the present case, Plaintiff argues Defendants engaged in an artifice to induce Plaintiff to forego its individual investigation into the wetlands by misrepresenting the size of the wetlands on the GGSH tract. *See Little v. Stogner*, 162 N.C. App. 25, 30, 592 S.E.2d 5, 9 (2004).

Plaintiff asserts the following actions by Defendants constituted an artifice to induce Plaintiff into forgoing further investigation into the wetlands delineations: (1) Sellers admitted to telling Plaintiff that the GGSH tract contained approximately twenty-five acres of jurisdictional wetlands; (2) GGSH represented in the contract of sale that there were no known violations of environmental laws on the GGSH tract; and (3) Defendants entered into an undisclosed agreement with Ball for the payment of $90,000 conditioned on the GGSH tract selling for $4,500,000. However, we cannot agree that the above actions by GGSH induced Plaintiff to forego further investigation. Plaintiff had notice of the deficiencies in the Master Wetlands Map provided by Ball and yet chose not to address these deficiencies with either the Corps or GGSH.

Ferree testified in his deposition that it had come to his attention through Teal that the work Ball had done for the GGSH tract, and other tracts owned by Plaintiff, were signed by Davis who was not working for the Corps at the time the delineations and the Master Wetlands Map were completed. Ferree testified that he informed Teal that "we need to get to the bottom of this," and that someone needed to talk to Ball and Davis. Ferree testified: "I think [Teal] knew we needed to do some investigation." Ferree further testified that Teal raised concerns that there was no legend on the delineations and the Master Wetlands Map, which was required by the Corps. Ferree testified that he wrote a letter to Poston concerning these issues, and that Teal had contacted Poston about them as well. Ferree also contacted Tanner, and informed him of the potential issues with the delineations and the Master Wetlands Map, to which Tanner responded: "Let's check it out." Ferree advised Blanton "not to use anything with Davis' signature until we investigate." At least one of the maps purportedly approved by Davis had his name typed as "Alan Davis" below the signature Ball has acknowledged he forged. Davis' first name is spelled "Allen." In a letter to Blanton reas-

suring him that there were no problems with the maps, Ball incorrectly spelled Davis' first name "Alan." Ferree testified he did not believe Plaintiff ever contacted Davis to investigate. Blanton testified that he was told by Plaintiff not to talk to Sellers about the concerns raised by the delineations and the Master Wetlands Map, that "it was just best not to say anything."

We hold the present case to be analogous to *RD&J Properties* and *MacFadden*. Here, the representatives of Plaintiff and Defendants were sophisticated businessmen with experience in real property development in coastal communities. Plaintiff, upon learning that the Master Wetlands Map was dated more than two years prior to the date it was delivered, and that the map was signed by an individual who no longer worked for the Corps, did not contact the Corps or seek reassurance from GGSH regarding the wetlands. Plaintiff chose to purchase the GGSH tract despite these clear deficiencies in the wetlands delineations and the Master Wetlands Map. Moreover, Defendants provided Plaintiff with a key to the GGSH tract giving Plaintiff unfettered access to the GGSH tract and ample opportunity to inspect the GGSH tract. We therefore hold that Plaintiff did not reasonably rely on any misrepresentations made by Defendants. This argument is without merit. Because we hold that summary judgment was properly granted on this claim, we do not address Plaintiff's argument concerning *caveat emptor*.

## II.

**[2]** In Plaintiff's second argument, it contends that the trial court erred in granting Defendants' motion for summary judgment because genuine issues of material fact exist as to Plaintiff's claim for unfair and deceptive trade practices. We disagree.

A claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75.1-1 must allege that: "(1) the [defendant] committed an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the [plaintiff] or to the [plaintiff's] business." *Walker v. Sloan*, 137 N.C. App. 387, 395, 529 S.E.2d 236, 243 (2000). "Where an unfair or deceptive practice claim is based upon an alleged misrepresentation by the defendant, the plaintiff must show 'actual reliance' on the alleged misrepresentation in order to establish that the alleged misrepresentation 'proximately caused' the injury of which plaintiff complains." *Tucker v. Blvd. at Piper Glen LLC*, 150 N.C. App. 150, 154, 564 S.E.2d 248, 251 (2002).

Plaintiff contends that the facts alleged in its first argument tend to show that GGSH bribed Ball with the promise of a $90,000 payment to Ball if the GGSH tract sold for $4,500,000. Plaintiff argues that this bribe created an incentive for Ball to misrepresent the amount of wetlands on the Master Wetlands Map, which constituted an unfair and deceptive trade practice. However, as held above, Plaintiff has failed to establish that it actually relied on the misrepresentations in the Master Wetlands Map.

We hold that Ball's wetlands delineations and the Master Wetlands Map were so facially flawed that Plaintiff could not have reasonably relied on them in deciding to purchase the GGSH tract. In light of Plaintiff's experience in developing coastal communities and the fact that Plaintiff had unfettered access to the GGSH tract, we cannot determine that Plaintiff actually relied on the Master Wetlands Map that was dated more than two years earlier and signed by an individual no longer employed by the Corps. Thus, the trial court did not err in granting summary judgment on the issue of unfair and deceptive trade practices. This argument is without merit.

III.

[3] In Plaintiff's third argument, it contends that the trial court erred in granting Defendants' motion for summary judgment because genuine issues of material fact exist with respect to Plaintiff's breach of contract claim and whether the claim is barred by the doctrine of merger. We agree in part.

The trial court found that Plaintiff's breach of contract claim was barred by the doctrine of merger which states that "[g]enerally, a contract for the sale of land is not enforceable when the deed fulfills all the provisions of the contract, since the executed contract then merges into the deed." *Biggers v. Evangelist*, 71 N.C. App. 35, 38, 321 S.E.2d 524, 526 (1984). "However, it is well-recognized that the intent of the parties controls whether the doctrine of merger should apply." *Id.* Because the parties in *Biggers* included a survival clause in their contract and because there was no language in the deed suggesting that survivability had been waived, our Court held the plaintiffs were "entitled to bring an action on the contract" *Id.* at 38-39, 321 S.E.2d at 527.

Plaintiff argues Defendants breached the environmental warranties contained in the contract of sale. The contract in the instant case contains a survival clause in the "Representations and War-

ranties of Seller" section which states that: "Seller's representations and warranties shall survive closing." Included in this same section is the warranty that "[t]here are no known violations of environmental laws on or which have occurred with respect to the [GGSH tract]." Plaintiff and Defendants clearly intended the warranty regarding the environmental violations to survive closing, and thus we hold that Plaintiffs were entitled to bring an action on the contract for any violations of the "Representations and Warranties" section of the contract, including the section covering "known violations of environmental laws."

Defendants argue that there is no evidence that they "knew" of any violations of environmental law because there had been no final determination by any governmental body that the roads and ditches they constructed upon the GGSH tract had violated any environmental laws. However, evidence presented at the hearing, when viewed in the light most favorable to Plaintiff, tends to show the following: On 11 February 1985, Defendants' attorney, Benjamin H. Bridges, III (Bridges) met with a staff member of the Corps to discuss obtaining a permit to disturb wetlands regulated by the Corps for the purposes of a residential development. Defendants submitted their application for said permit, which was received by the Corps on 13 August 1985. By letter received 14 November 1985, Defendants informed the Corps that they intended to withdraw their application for developing the GGSH tract, and indicated that they wished to use the GGSH tract for timber harvesting and farming activities instead.

Defendants hired environmental consultants Larry Baldwin (Baldwin) and Robert Moul (Moul) to create a drainage plan on the GGSH tract in 1987. By letter dated 7 November 1987, Baldwin advised Gore and Moul that: "A large majority of the 464 acre tract has wetland soils. Thus, most of the tract would require intensive drainage in order to lower the water table and convert it from its' [sic] wetland status. The major problem to drain this area is a suitable outlet." "To convert the [GGSH tract] from its' [sic] wetland status will require intensive drainage improvements of nearly the entire tract. [N]o natural drainage outlet on the tract make[s] it difficult to drain." "Since no natural outlet exists on the tract a drainage easement(s) will have to be obtained from adjacent property owner(s)." " '404' regulations [of the Clean Water Act] prohibit any fill to be placed onto wetland sites." "After all drainage improvements are established it will take 5 to 12 months to lower the water table 12 inches below the soil surface. Subsequent successional changes in

vegetation would take 12 to 24 months and possibly longer. All drainage improvements must be maintained to allow constant drainage or the area will revert to wetlands."

By letter dated 2 August 1989, the Corps acknowledged a letter dated 21 July 1989 in which a representative of Defendants had again informed the Corps of Defendants' intention to use the GGSH tract for timber harvesting. In the Corp's response, it stated:

Construction of timber roads is exempt from the provisions of Section 404 of the Clean Water Act provided the following conditions are met:

a. Widths are held to a practicable minimum;

b. Normal surface flows are maintained by culverting, bridging, etc.;

c. Borrow ditches are not connected to outside waters;

. . . .

e. A change in use of the road for purposes other than timber harvest or management will require Department of the Army permit authorization. Failure to obtain this approval is a violation of Federal Law and will result in removal of all road fill in its entirety and/or civil or criminal penalties.

Defendants contacted Charles Adams (Adams), a golf course architect, in 1989. Defendants and Adams agreed that Adams could obtain a twenty percent interest in GGSH if, among other things, he did all the architectural work necessary to lay out two eighteen-hole golf courses, and build and construct all roads and drainage ditches necessary therefor. Defendants informed Adams where the roads and drainage ditches were to be located. Adams constructed the roads and ditches for Defendants in late 1989 through approximately mid-1990. Adams was never informed that the roads were being built for timber harvesting purposes. After Adams dug the ditches, they filled with water and drained off of the GGSH tract.

In a letter dated 19 July 1991, Lee Anderson (Anderson), an environmental consultant retained by Defendants, informed Defendants that because of "the added asset of being drained by ditching, previous to October 1990, . . . the vegetation is beginning to appear with a majority of upland [non-wetland] vegetation." Anderson further stated:

SUNSET BEACH DEV., LLC v. AMEC, INC.

[196 N.C. App. 202 (2009)]

It is also important to make mention that we do not change the name of this project. If we were to do so it would give the Federal Agency an opportunity to issue an updated correspondent number and we would not be able to enjoy the benefits of the grandfather clauses that were in use prior to the physical year 1991. That was the purpose in the beginning for obtaining continual correspondence with the agencies. It is necessary from time to time for me to discuss this project although it is in the embryonic stages so that I may keep this file active.

In these meetings very little is ever discussed or decided upon. It only allows our project to remain active. If the file becomes dormant for an extended period of time it then becomes in jeopardy for closure due to lack of interest.

In my opinion, I feel that with all of our diligent efforts we should be somewhere right around that figure [reduction to twenty-five percent jurisdictional wetlands]. I do not want an approved delineation at this time, because, until a development plan can be established it would be futile and self destructive to have a final delineation before we have a final project. If this were the case we would be forced to make the project fit around the wetlands which are constantly decreasing in size as time elapses.

The wetlands are deteriorating just as we had expected. This would also limit the versatility of any future buyers and would only increase the adversity of selling a tract of land of this size.

In closing, I must say that, this property is very suitable for a golf course development and I will help your firm in any way possible.

Plaintiff presented the deposition testimony of two proposed expert witnesses, and an affidavit of a third, at the summary judgment hearing. Robert Riggs (Riggs), who had worked for the Corps for thirty-seven years, testified that in his opinion the roads and ditches were "constructed for the development and the draining of the wetlands." Riggs opined that the size, number and spacing of the ditches indicated a clear intent "to drain the wetlands and make them non-wetlands." He testified that the ditches were in violation of law because, contrary to timber harvesting permit regulations, they were connected to "offsite or other water courses" and allowed the "discharge of dredged or fill material into waters of the United States."

Thomas Rowland (Rowland), a Society of American Foresters certified forester and a registered forester in the states of North and

South Carolina, testified that the roads built on the GGSH tract were, in his opinion, not for the purpose of timber harvesting. Rowland testified that timber harvesting roads were required to be as narrow as practicable, in order to limit the impact on the land. He testified that the roads on the GGSH tract were twice the width of normal timber roads, and the ditches were much larger than would be needed. According to Rowland: (1) the expense of the road and ditch work done on the GGSH tract would have been greater than the value of the harvestable timber, (2) Defendants did not begin any harvesting for five years after the roads were completed, and (3) Defendants sold the timber for twenty-five percent of its estimated value based on figures approximately seven years old. Rowland testified that though he did see some evidence of timber harvesting, it was minimal, haphazard and unprofessional. He testified that, unlike the road system he observed upon the GGSH tract, which tended to travel around the perimeter of the property, logging roads usually cut through the middle of the property. Rowland noticed that none of the harvested land had been replanted, and determined that there was no forest management plan for the tract.

Gary A. Mitchell (Mitchell), a senior vice president of Clark Environmental and a previous employee of the Wilmington office of the Corps, executed an affidavit in which he gave his assessment of the GGSH tract. Mitchell stated that at the time "the roads and ditches were installed [on the GGSH tract], it was (and still is), without first obtaining a permit, unlawful under the regulations to construct 'drainage ditches' for purposes of reducing wetlands in order to develop the property." Mitchell observed that the fill material excavated from the ditches was "sidecasted" or deposited in the wetlands, "which, without a permit or exemption, was (and still is) unlawful under the regulations." The ditches constructed on the GGSH tract violated the "minor drainage" limitation exemption for timber harvesting usage. His opinion was that the ditches and roads on the GGSH tract were in violation of the Clean Water Act. After Mitchell consulted with the Environmental Protection Agency, he opined that the drained wetlands must be treated as wetlands for any delineation purposes. His firm conducted a delineation of the GGSH tract, and determined that 419 acres of the approximately 453 acres of the GGSH tract were "jurisdictional wetlands regulated by the Corps of Engineers."

Plaintiff also presented as evidence a letter from the Environmental Protection Agency stating that "some of the ditches [on the

GGSH tract] were not excavated in compliance with the Clean Water Act (CWA)." The letter also stated that "a final jurisdictional analysis [would need to] be performed [to] accurately determine the full extent of the wetlands that were on the [GGSH tract] prior to the ditching activity."

It is undisputed that Defendants never applied for an updated permit from the Corps that would allow for development of a golf course or any other development upon the GGSH tract. We hold that the evidence, when viewed in the light most favorable to Plaintiff, presents issues of material fact concerning whether Defendants knew of violations of environmental laws on, or which have occurred with respect to, the GGSH tract. We reverse the judgment of the trial court, and remand for a trial on the merits on this issue.

[4] Plaintiff also argues that Defendants breached the section of the contract which represented that the GGSH tract contained approximately twenty-five acres of jurisdictional wetlands because it was later revealed that more than twenty-five acres of the property were wetlands. The section regarding the wetlands delineation is in a section separate from the "Representations and Warranties" section of the contract. It is clear from the contract that the survivorship language was meant only to apply to those items under the "Representations and Warranties" section of the contract, and not to any other section. Thus, unlike the section of the contract regarding environmental violations, there is no evidence Plaintiff and Defendants intended the section of the contract concerning the amount of wetlands on the GGSH tract to survive closing. We hold that this provision merged with the deed at the time of closing. Plaintiff's opportunity to avail itself of this provision has thus been lost. This part of Plaintiff's argument is without merit.

IV.

[5] In Plaintiff's fourth argument, it contends the trial court erred in granting summary judgment because genuine issues of material fact existed with respect to Plaintiff's claim for breach of the covenant of good faith and fair dealing. We agree.

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Authority, Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (citation and quotation marks omitted). We have held that issues of

material fact exist concerning Defendants' potential violations of environmental law. If it is ultimately determined that environmental violations occurred, this would render the GGSH tract unsuitable for the purpose intended and contemplated by both parties in the contract for sale of the GGSH tract. We hold that there are issues of material fact yet to be decided relevant to Plaintiff's claim for breach of implied covenant of good faith and fair dealing. The trial court erred in deciding this issue at the summary judgment stage.

V.

[6] In Plaintiff's fifth argument, it contends the trial court erred in finding that no issue of material fact exists with respect to Plaintiff's claim for rescission and whether that claim is barred by the doctrine of unclean hands. We disagree.

In *Hinson v. Jefferson*, 287 N.C. 422, 215 S.E.2d 102 (1975), the North Carolina Supreme Court held that

> because of the uncertainty surrounding the law of mistake we are extremely hesitant to apply this theory to a case involving the completed sale and transfer of real property. Its application to this type of factual situation might well create an unwarranted instability with respect to North Carolina real estate transactions and lead to the filing of many non-meritorious actions.

*Id.* at 432-33, 215 S.E.2d at 109. Although in *Hinson*, the Supreme Court rejected the theory of mutual mistake of fact as the basis for rescission of an executed real estate contract, our Court recently held in *Taylor v. Gore*, 161 N.C. App. 300, 304, 588 S.E.2d 51, 55 (2003) that " 'certain mistakes will justify the rescission of an executed real estate contract; [and] a mistake induced by a misrepresentation is as persuasive a case for rescission as any.' " *Id.* (quoting *Howell v. Waters*, 82 N.C. App. 481, 491, 347 S.E.2d 65, 71 (1986)). Therefore, because Plaintiff argues its mistake as to the size of the wetlands on the GGSH tract was induced by a misrepresentation, we address the merits of Plaintiff's argument.

In *Howell*, which involved a mutual mistake of fact concerning property boundaries, our Court held the elements for rescission of a contract based on mutual mistake of fact were:

> (1) Did [the] plaintiff exercise due diligence in discovering the alleged mistake such that his action is not barred by the three year statute of limitations in N.C. Gen. Stat. 1-52(9)?;

(2) Has [the] plaintiff presented clear, cogent and convincing evidence establishing that he was mistaken regarding the boundaries of the property to be conveyed?;

(3) If [the] plaintiff was mistaken, did [the] defendant or [the] defendant's agent have reason to know of [the] plaintiff's mistake or cause [the] plaintiff's mistake?;

(4) Was the mistake material?; and

(5) Did [the] plaintiff assume the risk of a mistake by:

(a) unreasonably relying on [the defendant's] representations or

(b) treating his limited knowledge of the boundaries of the property to be conveyed as sufficient?

*Howell*, 82 N.C. App. at 491-92, 347 S.E.2d at 72. If the trier of fact answers the first four questions affirmatively and the fifth negatively, then the plaintiff is entitled to rescission of the contract. *Id.* We find no reason why the amount of wetlands on a property should be treated differently than the location of the boundaries of a property.

In the present case, we have held above that Plaintiff did not reasonably rely on Ball's representations of the size of the wetlands on the GGSH tract. Ball's Master Wetlands Map contained clear deficiencies on its face. Reliance on the map was not reasonable, nor did the map provide Plaintiff with sufficient knowledge of the wetlands to justify Plaintiff's mistake. Because we hold that Plaintiff is not entitled to rescission of the contract, GGSH's defense of the doctrine of unclean hands need not be addressed.

## VI.

[7] In Plaintiff's sixth argument, it contends the trial court erred in finding that Plaintiff's damages were speculative. We agree.

At the end of the summary judgment hearing, the trial court stated:

Well, frankly if it survives summary judgment on the liability issues, damages matters—I don't know, I suppose that they could be properly dealt with here, it seems that y'all haven't made any here that aren't more properly addressed 7 days from now. If we're there at 7 days from now.

Because the trial court did not address the issue of damages at the summary judgment hearing and instead stated that damages would be

addressed at trial if Plaintiff's claims survived summary judgment, it was error for the trial court to base its grant of summary judgment in favor of Defendants on any issue related to damages.

## VII.

**[8]** In Plaintiff's seventh argument, it contends the trial court erred in finding that Plaintiff spoliated evidence. We agree.

Evidence of spoliation by a party allows the trier of fact to make an inference that the spoliated evidence was detrimental to that party's case. The inference is not mandatory, but lies within the province of the trier of fact. *McLain v. Taco Bell Corp.*, 137 N.C. App. 179, 183-85, 527 S.E.2d 712, 715-17 (2000). For this reason, it is improper to base the grant or denial of a motion for summary judgment on evidence of spoliation. It is not an issue to be decided as a matter of law, and cannot, by its mere existence, be determinative of a claim. *See id.* The trial court erred in granting summary judgment on the basis of spoliation.

We affirm in part, and reverse and remand in part for further action consistent with the holdings in this opinion.

Affirmed in part, reversed and remanded in part.

Chief Judge MARTIN and Judge STEPHENS concur.