IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-1084

Filed:  4 February 2020

Mecklenburg County, Nos. 16 CVS 19141, 17 CVS 21467

MATTHEW WAGNER, et al., Plaintiffs

v.

CITY OF CHARLOTTE, Defendant

Appeal by Plaintiffs from Orders entered 2 April 2018 by Judge W. Robert Bell in Mecklenburg County Superior Court.  Heard in the Court of Appeals 24 April 2019.

*The Odom Firm, PLLC, by Thomas L. Odom, Jr., and David W. Murray, for plaintiffs-appellants.*

*Law Offices of Lori Keeton, by Lori R. Keeton, and Charlotte City Attorney's Office, by R. Harcourt Fulton, for defendant-appellee.*

HAMPSON, Judge.

**Factual and Procedural Background**

Matthew Wagner (Wagner), Lianne Lichstrahl (Lichstrahl), Brad Henke (Henke), and Victoria Siravo (Siravo) (collectively, Plaintiffs) appeal from an Order entered 29 March 2018: (1) granting Summary Judgment to the City of Charlotte (the City) on Plaintiffs' claims for Inverse Condemnation, Negligence, Private Nuisance, Trespass, and violations of Due Process and Equal Protection under the North

Carolina Constitution and dismissing Plaintiffs' claims in both 16 CVS 19141 and 17 CVS 21467; and (2) dismissing as moot, *inter alia*, Plaintiffs' Motion for Partial Summary Judgment on Inverse Condemnation, Plaintiffs' Motion to Strike the City's Affirmative Defenses or, in the alternative, for Summary Judgment as to the City's Affirmative Defenses, Plaintiffs' Motion for Protective Order, and Plaintiffs' request to consolidate the related actions. Plaintiffs also appeal from a separate Order entered on the same day denying their Motion for Reconsideration but, in briefing, raise no distinct arguments regarding this separate Order. The Record before us tends to show the following:

As of 23 November 2014, Wagner and Lichstrahl owned and resided at 3414 Carmel Road, although they subsequently sold this property in 2016 prior to commencing this litigation. Henke and Siravo were the owners and residents of 3418 Carmel Road, which they continued to own during the litigation.

In the early morning hours of 23 November 2014, a City water main pipe burst in the 4100 block of Carmel Road in Charlotte. The City Fire Department received a 911 call at around 6:20 a.m. and in turn alerted the City's water department (City Water). At 6:24 a.m., a dispatcher for City Water contacted team leaders regarding a potential hydrant leak. At 6:48 a.m., the team leaders instructed the dispatcher to send a crew to make repairs. No crew was immediately available, so an on-call repair crew from Huntersville was paged between 6:45 and 7:00 a.m. The first crewmember

reported to Huntersville at 7:19 a.m. The Huntersville crew did not arrive and begin cutting off water until 8:40 a.m.

As a result of a separate call to 311 by a neighboring homeowner at 7:16 a.m., a City Water Customer Service Technician also reported to the scene, arriving at 7:40 a.m. The Customer Service Technician called in an emergency requiring additional crew between 7:45 and 8:00 a.m. with a second call being made between 8:30 and 8:35 a.m.

Henke awoke at around 6:30 a.m. to discover the Henke/Siravo residence had already flooded. Wagner testified the Wagner/Lichstrahl residence began to flood around 8:15 or 8:30 a.m., although he had also previously reported flooding began between 7:15 and 8:00 a.m. The City contends the flooding likely began even earlier than that.

The water was not cut off at the main and did not begin to recede from the homes until between 9:30 and 10:00 a.m. As a result of the burst water main, both residences flooded and suffered flood damage. Plaintiffs were required to temporarily move out of their homes while the homes underwent substantial repair and renovation.

In the days following, Plaintiffs submitted claims to the City for their respective damages. On 19 December 2014, the City denied those claims based on its own investigation determining there was no negligence on the part of the City.

Plaintiffs met with City representatives on 28 January 2015, where the City reiterated its position. Plaintiffs submitted public records requests to the City seeking documents related to their claims, and the City responded to those records requests in January and April 2015. On 10 September 2015, Plaintiffs, through counsel, wrote to the City informing the City that Plaintiffs were represented by counsel and were pursuing claims. This letter also requested the City preserve all evidence related to the claims including the section of the broken pipe. After receiving this letter, the City instituted a litigation hold on 30 September 2015. At some point between the January 2015 meeting and the City's receipt of Plaintiffs' letter, however, the City had already disposed of the section of broken pipe through its usual scrap sale process.

On 24 October 2016, Plaintiffs filed their first Complaint against the City in Mecklenburg County Superior Court[1] (the 2016 Lawsuit). This Complaint alleged claims including: Negligence, due to the City's failure to properly install or maintain the pipe and failure to promptly cut off water to and repair the pipe when it ruptured; Private Nuisance; Inverse Condemnation of a Temporary Drainage Easement; Unlawful Taking under the Fifth Amendment of the United States Constitution; violation of Equal Protection pursuant to the Fourteenth Amendment; and Unlawful

---

[1] Mecklenburg County Superior Court file number 16 CVS 19141.

Taking under the North Carolina Constitution. The Complaint further alleged spoliation of evidence arising from the City's disposal of the broken section of pipe.

On 21 November 2016, the City filed a Notice of Removal to the United States District Court for the Western District of North Carolina, asserting the case invoked a federal question citing Plaintiffs' claims under the United States Constitution. On 29 December 2016, Plaintiffs filed a Motion for Leave to File an Amended Complaint in the United States District Court along with a Motion to Remand to State Court. The proposed Amended Complaint abandoned Plaintiffs' claims under the United States Constitution. The United States District Court granted both Motions on 27 February 2017. Upon remand to state court, Plaintiffs filed their Amended Complaint on 10 March 2017. On 4 April 2017, the City filed an Answer to the Amended Complaint, including a Motion to Dismiss and multiple affirmative defenses.

On 21 November 2017, Plaintiffs initiated a second action (the 2017 Lawsuit) by filing a Complaint asserting a trespass-based claim.[2] Meanwhile in the 2016 Lawsuit, on the same day, Plaintiffs filed a Motion to Amend their Complaint to add Trespass as a cause of action.

On 4 December 2017, Plaintiffs filed a Motion for Partial Summary Judgment in the 2016 Lawsuit as to their claims for Inverse Condemnation, Private Nuisance,

---

[2] 17 CVS 21467.

and Trespass. Plaintiffs also filed a Motion to Strike Defendant's Affirmative Defenses, or in the alternative, Motion for Summary Judgment to Dismiss Defendant's Affirmative Defenses. In a Motion, filed the same day, in the 2017 Lawsuit, Plaintiffs requested the 2017 Lawsuit be consolidated with the 2016 Lawsuit. On 12 December 2017, the City filed its own Motion for Summary Judgment. On 19 December 2017, the City also filed a separate Motion to Dismiss the 2017 Lawsuit.

The matter came on for hearing before the trial court on 26 February 2018, and the trial court rendered its ruling on 9 March 2018, granting the City's Motion for Summary Judgment. On 14 March 2018, Plaintiffs filed a Motion for Reconsideration of this ruling. On 2 April 2019, the trial court entered its Order granting the City's Motion for Summary Judgment and denying the remaining motions as moot. The trial court determined the City was entitled to summary judgment as to all claims—specifically, Plaintiffs' claims for Inverse Condemnation, Negligence, Trespass,[3] Private Nuisance, Equal Protection, Due Process, and Spoliation. This Order dismissed both the 2016 and 2017 Lawsuits. The same day, the trial court entered a separate Order denying Plaintiffs' Motion for

---

[3] The parties and the trial court treated Plaintiffs' Motion to Amend the Complaint to add Trespass as a claim in the 2016 Lawsuit as having been granted for purposes of the Summary Judgment Hearing. As such, we too operate on the basis the Motion to Amend the Complaint was granted.

Reconsideration. On 12 April 2018, Plaintiffs timely filed Notice of Appeal from both Orders entered on 2 April 2018.

## Issues

On appeal, the dispositive issues are whether the trial court properly granted Summary Judgment for the City on Plaintiffs': (I) Inverse Condemnation claim based on a single, nonrecurring incidence of flooding resulting in temporary damage arising from the broken water pipe; (II) Negligence claims; (III) Private Nuisance claims; (IV) Trespass claims; and (V) the remaining state constitutional claims. We also, however, address the trial court's denial based on mootness of the remaining peripheral motions.

## Standard of Review

"This Court reviews the trial court's grant of summary judgment de novo." *Asheville Sports Properties, LLC v. City of Asheville*, 199 N.C. App. 341, 344, 683 S.E.2d 217, 219 (2009). "Summary judgment is appropriate only when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Id.* (quoting N.C. Gen. Stat. § 1A-1, Rule 56(c)).

## Analysis

### I. Inverse Condemnation

Plaintiffs first contend the trial court erred in granting Summary Judgment in favor of the City and denying Summary Judgment in favor of Plaintiffs, on Plaintiffs' Inverse-Condemnation claim. Plaintiffs asserted claims for Inverse Condemnation both under statutory grounds pursuant to N.C. Gen. Stat. § 40A-41 and under the Law of the Land Clause found in Article I, Section 19 of the North Carolina Constitution.

Under the North Carolina Constitution:

> We recognize the fundamental right to just compensation as so grounded in natural law and justice that it is part of the fundamental law of this State, and imposes upon a governmental agency taking private property for public use a correlative duty to make just compensation to the owner of the property taken. This principle is considered in North Carolina as an integral part of "the law of the land" within the meaning of Article I, Section 19 of our State Constitution.

*Long v. City of Charlotte*, 306 N.C. 187, 196, 293 S.E.2d 101, 107-08 (1982).

> " '[I]nverse condemnation [ ]' [is] a term often used to designate 'a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.' "

*Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 552, 809 S.E.2d 853, 861-62 (2018) (alterations in original) (quoting *City of Charlotte v. Spratt*, 263 N.C. 656, 662-63, 140 S.E.2d 341, 346 (1965)). "Inverse condemnation is simply a device to force a governmental body to exercise its power of condemnation, even though it may have

no desire to do so." *Smith v. City of Charlotte*, 79 N.C. App. 517, 521, 339 S.E.2d 844, 847 (1986). Section 40A-51 of our General Statutes provides for the remedy of inverse condemnation when "property has been taken by an act or omission of a condemnor listed in [N.C. Gen. Stat §] 40A-3(b) or (c) and no complaint containing a declaration of taking has been filed[.]" N.C. Gen. Stat. § 40A-51 (2017).

In this case, there is no dispute as to the applicability of the statutory inverse condemnation procedure. Rather, the primary issue between the parties is whether any taking took place giving rise to a claim for inverse condemnation. Specifically, Plaintiffs contend the broken water pipe and resultant, one-time flooding of their properties constituted a governmental taking entitling them to compensation. On the other hand, the City argues a one-time, temporary flooding incident caused by a broken water pipe should not constitute a taking under our existing case law.

Indeed, our Courts have, on several occasions, addressed whether flooding of private property resulted in a taking. In *Eller v. Board of Education of Buncombe County*, our Supreme Court held property owners stated a takings claim where they alleged construction of a school building impeded the flow of a natural spring causing it to back up on to the private property and that the installation of a sewage disposal device contaminated the natural spring, rendering both it and the property owners' dwelling unfit. 242 N.C. 584, 586, 89 S.E.2d 144, 146 (1955). Similarly, in *Department of Transportation v. Bragg*, our Supreme Court held a property owner

was entitled to present evidence of damages resulting from a highway construction project that resulted in a spring being diverted to drain onto the defendants' property and running underneath their motel. 308 N.C. 367, 369, 302 S.E.2d 227, 229 (1983) (holding "[e]vidence of damage caused by the alleged water diversion is relevant to a determination of the amount of just compensation due for the taking of the property" either as a permanent or temporary drainage easement).

In *Midgett v. North Carolina State Highway Commission*, our Supreme Court held property owners stated a takings claim where highway construction resulted in the damming of ocean water flowing over dunes and inundating private property. 260 N.C. 241, 248, 132 S.E.2d 599, 607 (1963), *overruled on other grounds by Lea Co. v. N.C. Bd. of Transp.*, 308 N.C. 603, 304 S.E.2d 164 (1983). The *Midgett* Court set out the following controlling principles of law:

> There need not be a seizure of the property or dispossession of the owners; it is a taking if the value is substantially impaired. Permanent liability to intermittent, but inevitably recurring, overflows constitutes a taking. In order to create an enforceable liability against the government it is, at least, necessary that the overflow of water be such as was reasonably to have been anticipated by the government, to be the *direct* result of the structure established and maintained by the government, and constitute an actual permanent invasion of the land, or a right appurtenant thereto, amounting to an appropriation of and not merely an injury to the property.

*Id.* (citations omitted). The *Midgett* Court further described the necessity for a "permanent" taking:

> To constitute a permanent invasion of property rights and an impairment of the value thereof the obstruction or structure need not be permanent in fact, but it must be permanent in nature. A permanent structure is one which may not be readily altered at reasonable expense so as to remedy its harmful effect, or one of a durable character evidently intended to last indefinitely and costing practically as much to alter or remove as to build in the first place.

*Id.* However, the Court also made clear:

> The removal of the permanent structure during the pendency of the action and after direct damage has resulted from its construction and maintenance would not abate the action or prevent the recovery of permanent damages. Once the cause of action has occurred by the infliction of damage to the property, the taking is a *fait accompli*.

*Id.* at 248-49, 132 S.E.2d at 607 (citations omitted).

Subsequently, in *Lea Co.*, our Supreme Court upheld a judgment in favor of a landowner where "the evidence tended to show that the structures built and maintained by the defendant caused increased flooding and substantial injury to the plaintiff's relatively high density apartments in an urban area." 308 N.C. at 620-21, 304 S.E.2d at 176. Building on *Midgett*, the Court emphasized: "Ordinarily, a mechanical approach should not be taken with regard to the frequency of flooding required to constitute a taking by '[p]ermanent liability to intermittent but inevitably recurring overflows . . . .'" *Id.* (quoting *Midgett*, 260 N.C. at 248, 132 S.E.2d at 606).

On the other hand, in *Akzona, Inc. v. Southern Railway Co.*, our Supreme Court, applying *Lea Co.*, held it was error to submit an inverse-condemnation claim

to a jury where an earth and gravel embankment constructed by the railway caused a creek to back up during a rainstorm flooding upstream property. *Akzona, Inc. v. S. Ry. Co.*, 314 N.C. 488, 494, 334 S.E.2d 759, 763 (1985) The Court noted: "Under pressure caused by relentless rainfall and the inability of a saturated ground to absorb moisture, the dam burst. It was not replaced after it burst. Railroad's embankment, therefore, cannot subject plaintiff's property to '[p]ermanent liability to intermittent, but inevitably recurring, overflows . . . .' " *Id.* (quoting *Lea Co.*, 308 N.C. at 618, 304 S.E.2d at 175). The Court stated its rule: "A single instance of flooding with no possibility of recurrence, even if the direct result of [the condemnor's] structure, is not a taking of [private] property." *Id.* at 494, 334 S.E.2d at 763.

In light of our Supreme Court's decision in *Akzona*, it would seem clear a single instance of flooding from a broken water pipe that was repaired within hours would not give rise to an inverse-condemnation claim. Plaintiffs, however, argue the United States Supreme Court's decision in *Arkansas Game & Fish Commission v. United States* altered the waterfront for analyzing inverse-condemnation claims arising from flooding. We disagree. To the contrary, *Arkansas Game & Fish Commission* is generally consistent with the analysis historically employed by our state courts.

In that case, over a period of approximately seven years, the U.S. Army Corps of Engineers periodically authorized flooding of forest land owned and managed by the Commission resulting in a loss of a substantial amount of timber. The

Commission brought an action alleging a taking under the Fifth Amendment of the United States Constitution. *Arkansas Game & Fish Comm'n*, 568 U.S. 23, 26, 184 L. Ed. 2d 417, 423 (2012). The U.S. Supreme Court stated the question presented in that case as "whether a taking may occur, within the meaning of the Takings Clause, when government-induced flood invasions, although repetitive, are temporary." *Id.* The Court concluded "recurrent floodings, even if of finite duration, are not categorically exempt from Takings Clause liability." *Id.* at 27, 184 L. Ed. 2d at 423. The Court clarified its ruling "that government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection." *Id.* at 38, 184 L. Ed. 2d at 430-31. Instead, the Court pointed to a number of factors under which to conduct the analysis, including the time or duration of the alleged taking, "the degree to which the invasion is intended or is the foreseeable result of authorized government action[,]" the character of the land and the owner's reasonable investment-backed expectations for the use of the land, and the severity of the interference with that use. *Id.* at 38-39, 184 L. Ed. 2d at 431.

This analysis is generally in harmony with our Supreme Court's decision in *Lea Co.*, which acknowledged even earlier U.S. Supreme Court precedent was not "intended to establish a requirement that flooding caused by government structures must be shown to occur with any particular frequency before a taking will have occurred." *Lea Co.*, 308 N.C. at 619, 304 S.E.2d at 175. Rather, the *Lea Co.* Court

observed the focus should be on "the substantiality of the injury[.]" *Id.* Our Supreme Court then put the key question as "whether it had been shown that substantial injury had been caused as the foreseeable direct result of the structure built and maintained by the government." *Id.* at 620, 304 S.E.2d at 176.

Thus, our Supreme Court's decision in *Lea Co.* is generally consistent with *Arkansas Game & Fish Commission* and, in fact, largely foreshadowed that decision. As such, *Arkansas Game & Fish Commission* does not alter our course here. *Akzona* followed the reasoning from *Lea Co.* and remains binding on this Court. Thus, we conclude a single instance of temporary flooding of Plaintiffs' properties without the possibility of recurrence did not constitute a taking for purposes of an inverse-condemnation claim. *See Akzona, Inc.*, 314 N.C. at 493-94, 334 S.E.2d at 762-63; *see also Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 329-30, 67 L.Ed. 287, 289 (1922) ("[W]hile a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove [a taking]. Every successive trespass adds to the force of the evidence.")[4]; *Barnes v. United States*, 538 F.2d 865, 870 (Ct. Cl. 1976) ("Government-induced flooding not proved to be inevitably recurring occupies the category of mere consequential injury, or tort.").

Our conclusion is further bolstered by the foreseeability analysis employed by both the *Lea Co.* and *Arkansas Game & Fish Commission* Courts. In *Lea Co.*, our

---

[4] Cited with apparent approval in *Arkansas Game & Fish Comm'n*, 568 U.S. at 39, 184 L. Ed. 2d at 431.

Supreme Court noted in order to establish a takings claim, the plaintiff was "required to show that the increased overflow of water was such as was reasonably to have been anticipated by the State to be the direct result of the structures it built and maintained." 308 N.C. at 614, 304 S.E.2d at 172. Specifically, the Court stated: "Injury properly may be found to be a foreseeable direct result of government structures when it is shown that the increased flooding causing the injury would have been the natural result of the structures at the time their construction was undertaken." *Id.* at 617, 304 S.E.2d at 174 (emphasis omitted); *see Arkansas Game & Fish Comm'n*, 568 U.S. at 39, 184 L. Ed. 2d at 431 (stating a relevant factor in the analysis is "the degree to which the invasion is intended or is the foreseeable result of authorized government action").

Here, it certainly cannot be said the City's installation of water pipes was intended to flood Plaintiffs' properties. Under *Lea Co.*, it also cannot be said the flooding was a foreseeable direct or natural result at the time of installation of those water pipes. *See Lea Co.*, 308 N.C. at 614, 304 S.E.2d at 172. Moreover, the installation of the water pipes predated the construction of the residential subdivision where Plaintiffs' homes were located. *See id.* at 617, 304 S.E.2d at 174 ("To require the State to anticipate the shifting of business and population centers and the attendant acts or construction by others contemporaneous with or subsequent to the State's construction, and to hold the State liable for a taking if it fails to do so, would

place an unreasonable and unjust burden upon public funds. No such result is required by the Constitution of the United States or the Constitution of North Carolina").[5] Consequently, the trial court properly granted Summary Judgment to the City on Plaintiffs' Inverse-Condemnation claims.[6]

## II. Negligence

Plaintiffs also argue the trial court erred in granting Summary Judgment for the City on Plaintiffs' Negligence claims. Plaintiffs advance theories that the City was negligent in failing to properly maintain or repair the pipe so as to prevent the leak and/or in its response to the leak once it occurred. A municipality operating a water system "is acting in its proprietary or corporate capacity and is liable for injury or damage resulting from such operation to the same extent and upon the same basis as a privately owned water company would be." *Mosseller v. Asheville*, 267 N.C. 104,

---

[5] We acknowledge Plaintiffs' efforts to direct us to California case law they argue is analogous. Specifically, Plaintiffs assert that rather than take a proactive approach to locating and replacing defective pipes, the City has taken a wait-and-see approach; repairing pipes only when a problem is discovered. Plaintiffs contend this was done as a cost-saving measure for the City and, thus, Plaintiffs advocate, the commensurate risk should be borne by the City, which may then spread out the cost among ratepayers. This approach was endorsed by the California Court of Appeals in *Pacific Bell v. City of San Diego*, 81 Cal. App. 4th 596, 613-14, 96 Cal. Rptr. 2d 897, 912-13 (2000), where, despite knowing its entire water infrastructure was obsolete and in need of full replacement, the City Council in San Diego actively chose not to raise rates and replace decrepit pipes. However, that case, in light of its predecessors under California law, rejected the foreseeability analysis in favor of a standard more akin to strict liability of water systems for damage caused by leaking pipes. We decline to divert from the standard set by our Supreme Court in *Midgett* and *Lea Co.* and the decisions flowing therefrom.

[6] Because of this result, we do not reach the City's alternative argument that the inverse-condemnation claim brought by Wagner and Lichstrahl should be dismissed for failure to follow the requirements of N.C. Gen. Stat. § 40A-51.

107, 147 S.E.2d 558, 561 (1966) (citations omitted). "It is not an insurer against injury or damage by water leaking from such system." *Id.* "It is liable only if the escape of the water was due to its negligence either as to the initial break in the water line or in its failure to repair or cut off the line so as to stop the flow." *Id.* (citation omitted).

*A. Failure to Maintain or Repair*

In *Mosseller*, the North Carolina Supreme Court set forth a municipality's duty of reasonable care in discovering and repairing breaks in its lines[7]:

> The reasonable care which is required of the city when engaged in such operation, like that required of a privately owned water company, includes the exercise of ordinary diligence to discover breaks in its lines and to correct such defects of which it has notice, or which it could have discovered by the exercise of reasonable inspection.

*Id.*

Here, there is no evidence the City had prior actual notice of any defect or problem with the water main resulting in the leak. Plaintiffs point to an interrogatory answer by the City which reflected "[d]ating back to 2012, Defendant is showing one repair at 3410 Carmel Road." Plaintiffs contend this interrogatory

---

[7] Plaintiffs argue *Mosseller* was distinguished and limited by *Fussell v. N.C. Farm Bureau Mut. Ins. Co.*, 364 N.C. 222, 695 S.E.2d 437 (2010). We disagree that *Fussell* limited *Mosseller*; rather, it simply highlighted the two cases presented different facts. *Id.* at 226-27, 695 S.E.2d at 440-41 (citation omitted). In *Fussell*, the Supreme Court held homeowners stated a claim for negligence for the flooding of a home where a Town of Apex employee actively turned on water service while the owners were not home and then failed to wait to see if it was working properly. *Id.* at 223, 695 S.E.2d at 438-39. Indeed, the facts of *Fussell* are different than the present case, which did not involve direct action by a City employee in starting the flow of water.

answer shows the City had prior knowledge of a problem with the water main in the vicinity of the leak at issue in this case. Additional evidence, including deposition testimony of a City employee who pointed to the specific work order, reflected this was a service call to locate pipes and not actually a repair. Plaintiffs point to no other evidence that this was a repair to create any issue of fact. Moreover, taken at face value, the interrogatory answer reflects a leak that was repaired and would not create direct notice to the City of a subsequent leak at a different point in the lines.[8] Thus, even taking the evidence in the light most favorable to Plaintiffs, this does not create a genuine issue of material fact supporting denial of summary judgment.

Plaintiffs further contend the City's disposal of the pipe constitutes spoliation of evidence, justifying a negative inference against the City and entitling them to a jury trial on this issue. However, "it is improper to base the grant or denial of a motion for summary judgment on evidence of spoliation. It is not an issue to be decided as a matter of law, and cannot, by its mere existence, be determinative of a claim." *Sunset Beach Dev., LLC v. AMEC, Inc.*, 196 N.C. App. 202, 220, 675 S.E.2d 46, 58 (2009) (citation omitted). This is because "the inference does not supply the place of evidence of material facts and does not shift the burden of proof so as to relieve the party upon whom it rests of the necessity of establishing a prima facie

---

[8] Of note is that the Record also reflects evidence that the leak at issue in this case had less impact on 3410 Carmel Road than Plaintiffs' properties. The owner of 3410 Carmel Road reported only some water intruding into his garage and yard.

case, although it may turn the scale when the evidence is closely balanced." *McLain v. Taco Bell Corp.*, 137 N.C. App. 179, 184, 527 S.E.2d 712, 716 (2000) (citation and quotation marks omitted).

Moreover, Plaintiffs' own expert testified the City had no duty to inspect underground water lines if there had been no reported issues. Plaintiffs' expert further testified: "I would not think that the [C]ity would have to worry about every inch of water line . . . if they did not have a reason to expect that the water line was ready to be broken or . . . is in poor repair[.]" Another Plaintiffs' expert, when asked if in his opinion there was anything the City could have done to prevent this leak, testified in deposition: "Not this specific event, no." Plaintiffs' evidence thus falls short of establishing a triable issue of fact as to whether the City exercised "ordinary diligence to discover breaks in its lines and to correct such defects of which it has notice, or which it could have discovered by the exercise of reasonable inspection." *Mosseller*, 267 N.C. at 107, 147 S.E.2d at 561. Consequently, the trial court properly granted Summary Judgment for the City on Negligence claims related to failure to inspect, repair, or maintain the pipe at issue in this case.

*B. The City's Response*

Plaintiffs further advance the theory the City was negligent in failing to timely respond to the water main break both by failing to have an emergency shut-off crew on standby to respond immediately to such incidents and by failing to timely cut off

the flow of water. Plaintiffs' forecast of evidence demonstrated City Water was first notified of a leak following a 911 call at around 6:20 a.m. At 6:24 a.m., a dispatcher for City Water contacted team leaders regarding a potential hydrant leak. At 6:45 a.m., the team leaders instructed the dispatcher to send a crew to make repairs. No crew was immediately available, so an on-call repair crew from Huntersville was paged between 6:45 and 7:00 a.m. The first crewmember reported to Huntersville at 7:18 a.m. The Huntersville crew did not arrive and begin cutting off water until 8:40 a.m.

As a result of a separate call to 311 by a neighboring homeowner at 7:16 a.m., a City Water Customer Service Technician also reported to the scene, arriving at 7:40 a.m. The Customer Service Technician called in an emergency requiring additional crew between 7:45 and 8:00 a.m. with a second call being made between 8:30 and 8:35 a.m. The water was cut off and began receding from the homes sometime between 9:30 and 10:00 a.m.

Plaintiffs introduced expert testimony that it would be reasonable to have a repair crew on immediate standby to respond to such an incident, a reasonable response time to arrive on scene would have been approximately 30 minutes, and further, it should have taken only approximately 30 minutes to shut off the water once the crews arrived on scene. Thus, it can be inferred from the evidence proffered

by Plaintiffs' expert that the City could have shut off the water by as early as approximately 7:30 a.m.

Plaintiffs concede even under their proffered standard, the Henke/Siravo residence would have flooded, as Henke's own testimony established he woke up at 6:30 a.m. to floodwaters already in the house. Thus, Summary Judgment on this theory was appropriately granted to the City as to Henke and Siravo.

However, the evidence reflects the Wagner/Lichstrahl residence, on the other hand, may not have flooded until as late as between 8:15 and 8:30 a.m. To be sure, the evidence, as the City points out, is conflicting, and the home may well have, in fact, flooded much earlier. The City further contends the evidence reflects a reasonable response time in shutting off the water under the circumstances. However, this creates disputes of material facts as to when the Wagner/Lichstrahl home actually flooded and if, in fact, the City's response time and/or diligence in shutting off the water was unreasonable, would swifter action have prevented flooding of the home. Consequently, on this limited theory of negligence applicable solely to Wagner and Lichstrahl, we conclude Summary Judgment was improper and reverse summary judgment on this claim.

### III. Private Nuisance

Plaintiffs argue the trial court erred in granting Summary Judgment on their claims for Private Nuisance. "In order to establish a claim for nuisance, a plaintiff

must show the existence of a substantial and unreasonable interference with the use and enjoyment of its property." *Shadow Grp., LLC v. Heather Hills Home Owners Ass'n*, 156 N.C. App. 197, 200, 579 S.E.2d 285, 287 (2003) (citation omitted). Indeed, Plaintiffs point to *Shadow Group, LLC* as supporting their position. In that case, after a bench trial, the trial court found the homeowners' association liable for creating a nuisance where water from the common areas of a subdivision flowed into townhomes within the subdivision. Efforts by the homeowners' association to remedy the problem only made matters worse. *Id.* at 198-99, 579 S.E.2d at 286. In affirming the trial court, this Court noted "one's action in interfering with the flow of water resulting in damage to another's property can constitute a private nuisance." *Id.* at 200, 579 S.E.2d at 287 (citation omitted).

The City, however, argues *Shadow Group, LLC* is distinguishable because it involved recurrent or ongoing flooding—not a single incident of flooding causing a single distinct injury to property. Rather, the City contends, Plaintiffs, if they have any remedy here, should be limited to negligence claims. To be sure, divining the difference between a private-nuisance and a negligence claim is not easy, and the distinctions appear murky at best. However, this Court has indicated where "the damage the plaintiffs complained of arose out of single physical injury, instead of an on-going injury[,]" the action sounds in negligence and not nuisance. *Walden v. Morgan*, 179 N.C. App. 673, 683, 635 S.E.2d 616, 624 (2006) (citation omitted); *see*

*Boldridge v. Construction Co.*, 250 N.C. 199, 203, 108 S.E.2d 215, 218 (1959) ("Indeed, taking the evidence according to its reasonable inferences, the nuisance, if it may be called such, was negligence-born, and must, in the legal sense, make obeisance to its parentage." (citation and quotation marks omitted)). Furthermore, in an analogous case, this Court held where a municipality's faulty sewage system resulted in an ongoing situation where raw sewage flowed into a homeowner's basement, this claim did constitute a nuisance, particularly after the municipality abandoned efforts to fix the problem. *Hughes v. City of High Point*, 62 N.C. App. 107, 109, 302 S.E.2d 2, 3 (1983). However, this Court also pointed out the critical distinction:

> As we understand the law, it is the maintenance of a structure or condition permanent in nature which constitutes a nuisance. The defendant would not be liable for a nuisance if it had negligently maintained or performed some work on a structure which caused some temporary inconvenience to the plaintiffs.

*Id.*

In this case, Plaintiffs' claim arises from a single incident of a burst water main resulting in temporary damage to their properties. As such, we conclude Plaintiffs' claims do not sound in nuisance. Thus, we affirm the trial court's grant of Summary Judgment to the City on Plaintiffs' Private-Nuisance claims.

## IV. Trespass

Plaintiffs also argue the trial court erred in granting Summary Judgment on their Trespass claims in the 2016 Lawsuit and, in turn, dismissing their separate

2017 Complaint. "In order to establish a trespass to real property, a plaintiff must show: (1) his possession of the property at the time the trespass was committed; (2) an unauthorized entry by the defendant; and (3) resulting damage to the plaintiff." *Shadow Group, LLC*, 156 N.C. App. at 201, 579 S.E.2d at 287 (citation omitted). Specifically, "[o]ne's action of causing water to flow onto another's property can constitute such a trespass." *Id.* (citation omitted). However,

> [e]xcept where the actor is engaged in an abnormally dangerous activity, an unintentional and non-negligent entry on land in possession of another, or causing a thing or third person to enter the land, does not subject the actor to liability to the possessor, even though the entry causes harm to the possessor or to a thing or third person in whose security the possessor has a legally protected interest.

*Smith v. VonCannon*, 283 N.C. 656, 661, 197 S.E.2d 524, 528 (1973) (citations and quotation marks omitted).

Here, there is no contention the City committed an intentional trespass. Rather, Plaintiffs rely on their claims for Negligence. As we have already concluded Summary Judgment was proper for the City as to Henke and Siravo on both theories of Negligence, we affirm Summary Judgment as to them on their Trespass claims in the 2016 Lawsuit and dismissal of the same claim in the 2017 Lawsuit. Likewise, we affirm Summary Judgment to the City as to Wagner and Lichstrahl on the theory the City negligently maintained the water main. However, we reverse Summary Judgment as to Wagner and Lichstrahl on the theory the City was negligent in their

response to the water main burst resulting in flooding of their property in the 2016 Lawsuit and reverse dismissal of the 2017 Lawsuit on this limited theory.

## V. Constitutional Claims

Finally, Plaintiffs argue the trial court erred in granting Summary Judgment to the City on Plaintiffs' claims arising from alleged violations of their State constitutional protections affording the right to due process and equal protection when the City denied their claims for compensation arising from the flooding. Specifically, Plaintiffs contend the forecast of evidence reveals they were afforded different treatment than other similarly situated residents who submitted claims to the City for flood damage solely because Plaintiffs had property casualty insurance, and this constituted the basis for the City's denial. While it is true the City denied their claims and the evidence reflects Plaintiffs did have such insurance, we see no evidence in the Record to support any correlation between these two facts. To the contrary, our review of the evidence reflects the City applied the same process to Plaintiffs' claims as it did to others identified in the Record. Thus, the trial court properly granted Summary Judgment on Plaintiffs' remaining constitutional claims.

## VI. Other Motions

In light of our decision resulting in reversal, in limited part, of the trial court's grant of Summary Judgment to the City, we also vacate the trial court's dismissal of

the remaining Motions as moot. On remand, the trial court, with the assistance of the parties, should determine which of those Motions now require a decision.

## Conclusion

Consequently, for the foregoing reasons, we affirm Summary Judgment for the City on Plaintiffs' Inverse-Condemnation claims, Nuisance claims, and remaining constitutional claims. We affirm Summary Judgment for the City on the Negligence claims by Henke and Siravo. We affirm Summary Judgment for the City on the Negligence claim of Wagner and Lichstrahl on the theory of negligent maintenance of the water main but reverse Summary Judgment on the theory of the City's alleged negligent response to the water main break. Likewise, we affirm Summary Judgment in the 2016 Lawsuit and dismissal of the 2017 Lawsuit as to the Trespass claims brought by Henke and Siravo and reverse Summary Judgment in the 2016 Lawsuit and dismissal of the 2017 Lawsuit on the Trespass claims of Wagner and Lichstrahl based on the theory of the City's alleged negligence in responding to the water main break. Accordingly, we also vacate the trial court's dismissal of the remaining Motions as moot and remand this matter to the trial court to proceed on those Motions as necessary and to proceed with the remaining claims of Wagner and Lichstrahl.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.

Judge DILLON concurs.

Judge MURPHY concurs in part and in result only in part in a separate opinion.

No. COA 18-1084 – *Wagner, et al., v. City of Charlotte*

MURPHY, Judge, concurring in part and concurring in result only in part.

I fully join the Majority as to Parts II, III, and IV of its Analysis. However, I concur in the result only as to Part I. Although I join in the bulk of the Majority's Part I analysis, I must throw cold water on the portion that attempts to harmonize our Supreme Court's opinion in *Lea Co.* with the United States Supreme Court's opinion in *Ark. Game & Fish Comm'n*. The U.S. Supreme Court considered more factors in *Ark. Game & Fish Comm'n* than our Supreme Court did in *Lea Co.*[9] The

---

[9] The U.S. Supreme Court outlined at least five considerations:

> [(1)] When regulation or temporary physical invasion by government interferes with private property, our decisions recognize, time is indeed *a factor* in determining the existence *vel non* of a compensable taking.

> [(2)] Also relevant to the takings inquiry is the degree to which the invasion is intended or is the foreseeable result of authorized government action.

> [(3)] So, too, [is] the character of the land at issue. . . .

*MURPHY, J., concurring in part and concurring in result only in part.*

Majority focuses on only one factor in its attempt to synthesize *Lea Co.* and disregards the United States Supreme Court's holding:

> We rule today, simply and only, that government-induced flooding temporary in duration gains no automatic exemption from Takings Clause Inspection. When regulation or temporary physical invasion by government interferes with private property, our decisions recognize, time is indeed *a factor* in determining the existence *vel non* of a compensable taking.

*Ark. Game & Fish Comm'n,* 568 U.S. at 38, 184 L. Ed. 2d at 430-31 (emphasis added).

By contrast, and as the Majority outlines, *Lea Co.* only considered two elements. The first was "the substantiality of the injury." *Lea Co. v. N.C. Bd. of Transp.*, 308 N.C. 603, 619, 304 S.E.2d 164, 175 (1983). The second was "whether it had been shown that substantial injury had been caused as the foreseeable direct result of the structure built and maintained by the government." *Lea Co.*, 308 N.C. at 620, 304 S.E.2d at 176. This two-part analysis is, at best, a watered-down version of *Ark. Game & Fish Comm'n.*

The *Ark. Game & Fish Comm'n* factors must be calculated together with *Lea Co.*'s elements. I would find the *Ark. Game & Fish Comm'n* factors were also required to be "figure[d] in the calculus." *Ark. Game & Fish Comm'n*, 568 U.S. at 39, 184 L.

---

[(4) A]nd the owner's reasonable investment-backed expectations regarding the land's use.

[(5) The s]everity of the interference figures in the calculus as well.

*Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 38-39, 184 L. Ed. 2d 417, 430-31 (2012) (emphasis added and internal marks and citations omitted).

*MURPHY, J., concurring in part and concurring in result only in part.*

Ed. 2d at 431.  When "assessed by case-specific factual inquiry," *id.* at 38, 184 L. Ed. 2d at 431 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435, n. 12, 73 L. Ed. 2d 868, 895 (1982)), that analysis would result in finding an inverse condemnation here.

Despite this, the procedural posture of this case requires my concurrence and does not present an opportunity to dissent on an issue of which I have great passion. If we were considering whether or not there was a taking under the United States Constitution, then I would provide a full dissent and discuss why, in the light most favorable to Plaintiffs, the claims for inverse condemnation survive at this stage of the litigation.  However, on 29 December 2016, while this matter was before the United States District Court for the Western District of North Carolina, Plaintiffs filed their *Memorandum of Law in Support of Motion to Remand* informing the District Court that

> Plaintiffs' Proposed Amended Complaint contains no federal claims and no federal questions.  The [District] Court should decline to exercise supplemental jurisdiction over the state law claims.  Remanding this case to state court promotes the values of economy, convenience, fairness and comity.

Defendant subsequently agreed with Plaintiffs and consented to the Proposed Amended Complaint and the remand to state court in a filing dated 12 January 2017. On 27 February 2017, the federal court accepted the positions of the parties and

ordered this matter remanded to state court as the Amended Complaint "eliminat[ed] Plaintiffs' federal claims."

The U.S. Supreme Court's opinion in *Ark. Game & Fish Comm'n* dealt with a violation of the Takings Clause under the United States Constitution. Therefore, the framework set out therein only applies to takings under the Fifth Amendment as applied to North Carolina through the Fourteenth Amendment. Plaintiffs openly abandoned any claim thereunder when it sought to have this matter remanded to state court. *Lea Co.* cannot be harmonized with *Ark. Game & Fish Comm'n* in the way the Majority attempts, and properly applying the *Ark. Game & Fish Comm'n* factors in this case would lead to the opposite result.

However, as we are only applying North Carolina's analysis of a taking without reference to the United States Constitution, we are bound by *Lea Co.* as our high court's controlling consideration of what does and does not constitute a taking in these circumstances. Even so, I cannot agree with the Majority that "*Arkansas Game & Fish Commission* is generally consistent with the analysis historically employed by our state courts[,]" that its "analysis is in harmony with our Supreme Court's decision in *Lea Co.*[,]" that *Lea Co.* "largely foreshadowed *Arkansas Game & Fish Commission*[,]" or that *Ark. Game & Fish Comm'n* would "not alter our course here." Therefore, based upon the unique procedural history in this Record, I concur in the result only as to the claims for inverse condemnation.

*MURPHY, J., concurring in part and concurring in result only in part.*